IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel* | ) | |
| TAYLOR SMITH, JEANNINE PREWITT, | ) | |
| and JAMES AILES, | ) | |
| | ) | |
| Plaintiffs and Relators, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 05-1073-WEB |
| | ) | |
| THE BOEING COMPANY | ) | |
| and  DUCOMMUN, INC., | ) | |
| f/k/a AHF-Ducommun, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FALSE CLAIMS ACT AND OTHER RELIEF</u>

Plaintiffs-Relators Taylor Smith, Jeannine Prewitt, and James Ailes, by and through counsel, and acting on behalf of the United States of America and on their own behalf, bring and present this Complaint alleging as follows:

### I.    INTRODUCTION

1.    This is a *qui tam* action against defendant The Boeing Company.  Relators are or were senior employees of Boeing at the Boeing Commercial Airplanes--Wichita Division facility in Wichita, Kansas, all of whom were members of a procurement/quality assurance Audit Team ("Tooling Audit Team") created by Boeing to investigate the activities of AHF Ducommun (hereinafter "Ducommun"), a Boeing parts supplier.  The Tooling Audit Team, including Relators, uncovered serious defects in the manufacturing and quality control functions at Ducommun.  These defects resulted in the repetitive delivery, over a period of years, of

unapproved or bogus and/or nonconforming parts by Ducommun to Boeing. These unapproved parts were installed by Boeing in aircraft ultimately sold to the United States government. "Bogus" and/or nonconforming parts, or "unapproved" parts, are aircraft parts which cannot be shown to have been manufactured to meet engineering specifications. Bogus and/or nonconforming or unapproved parts are not airworthy from a safety engineering standpoint and cannot be used in airplanes.

2.      When Relators brought this information to the attention of Boeing management, the initial reaction within the Boeing procurement community was that a serious problem had been uncovered. However, as the ramifications of Boeing's own quality control deficiencies became understood to Boeing management, a radical change occurred. Relators became the subject of harassment, threats and intimidation. Rather than make disclosure to the United States Federal Aviation Administration ("FAA"), Boeing chose to cover up and conceal the information from the government.

3.      The problems identified by Relators constitute serious and ongoing breakdowns in the quality functions at both Boeing and Ducommun, and pose hazards to passengers and crew on aircraft manufactured by Boeing containing Ducommun parts.

4.      Through the actions of the Relators and dozens of its other employees, Boeing discovered that its supplier, Ducommun, did not manufacture conforming parts and, moreover, did not manufacture parts in accordance with the quality procedure requiring "First Article Inspections" (as described herein), that Ducommun did not collect or preserve the objective data ("SPC data," as defined herein) to prove achievement of key part characteristics, and that proper final inspections were not completed. In other words, the Ducommun parts were unapproved

parts. For these reasons, Boeing aircraft with Ducommun unapproved parts are not airworthy, are not safe, and must be grounded. The Boeing aircraft at issue are defective because they have been assembled with flight-critical parts and/or primary structural elements that were manufactured in violation of contract specifications or were not verified through a proper quality assurance process. Boeing and Ducommun have fraudulently concealed this information from the United States government.

5.     Also at issue is the knowing sale to the United States government of bogus and/or nonconforming spare parts which were made utilizing the same defective manufacturing and quality assurance processes.

6.     Aircraft with similarly unapproved Ducommun parts were delivered to the militaries and/or governments of foreign countries, which were procured in whole or part by those countries using funds of the United States, pursuant to the Foreign Military Sales ("FMS") program of the United States, to include, without limitation, Saudi Air Force, United Arab Emirates Government, Jordanian Government, Kazakhstan Government, Pakistan Government, Royal Malaysian Air Force, South African Air Force, Taiwan Air Force, Yemen Government, Australian Defense and Italian Air Force, and other FMS supported nations.

7.     Relators, therefore, bring this suit on behalf of the United States of America and on their own behalf for violations of the United States Civil False Claims Act, 31 U.S.C. § 3729, *et seq.*

8.     Relators seek to recover, on behalf of the United States government and themselves, damages, civil penalties and other relief from defendants arising from their presenting and/or causing to be presented false claims for payment to the United States

government, and for making or causing to be made false statements and records to get false or fraudulent claims paid or approved under government contracts for military aircraft, all in violation of the False Claims Act.

9.     Relators also seek damages from Defendant Boeing for violations of the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h), and the common law of Kansas.

## II.  JURISDICTION AND VENUE

10.     This action arises under the False Claims Act, 31 U.S.C., § 3729, *et seq.*

11.     This Court has jurisdiction pursuant to 31 U.S.C. § 3729(a) and 28 U.S.C. §§ 1331 and 1345.  This court also has jurisdiction over the Kansas Public Policy Claim (Count IV) pursuant to 28 U.S.C. § 1367(a), which gives this Court supplemental jurisdiction over pendent state law claims.  Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) because Boeing operates a major manufacturing facility in Wichita, Kansas.

12.     The facts and circumstances alleged in this Complaint have not been publicly disclosed in a criminal, civil, or administrative hearing nor in a congressional, administrative, or government accounting office report, hearing, audit, investigation, or in the news media.

13.     Relators are "original sources" of the information upon which this Complaint is based, as that term is used in the False Claims Act.

## III.  PARTIES

14.     The real party in interest to the primary claims in this action is the United States of America.

15.    Relator Taylor Smith is a resident of Savannah, Georgia. She was employed by Boeing from 1984 to 1987 as a Vendor Cost Analyst.  She was recruited by Boeing to return to Boeing in 1997 as a Contract Administrator, and was employed in the Boeing Supplier Management and Procurement organization until October 2003.

16.    Relator Jeannine "Gigi" Prewitt is a resident of Derby, Kansas.  She was employed by Boeing as a Material Management Analyst/Buyer from 1996 until November 2003.

17.    Relator James Ailes is a resident of Wichita, Kansas.  He has been employed by Boeing since 1979.  He has worked since 1991 as an Advanced Tech Development Analyst for Manufacturing Research and Development.

18.    Defendant The Boeing Company is a Delaware corporation that regularly conducts business in Kansas.  At all times material to the matters herein, Boeing was a supplier of goods and services, to include finished aircraft and aircraft components, to various departments of the United States, including, without limitation, the United States Air Force and the United States Navy.

19.    Defendant Ducommun is a Delaware corporation, headquartered in California. Defendant Ducommun was a subcontractor to Boeing pursuant to various purchase orders. Ducommun manufactures parts for Boeing civilian and military aircraft.

## IV.  FACTUAL ALLEGATIONS

A.    **Quality/Safety Requirements**.

20.    To manufacture and sell aircraft, Boeing is required under federal law to develop a quality assurance (QA) system which is submitted to the FAA for approval.  Approval from the FAA is dependent, among other requirements, upon a showing by Boeing that every part

assembled into the aircraft strictly conforms to specific engineering design drawings which themselves are to be approved. This requires the collection and preservation of objective data from the manufacturing process. 14 C.F.R. § 21.143(a).

21.    Hence, Boeing must require that its parts suppliers, such as Ducommun, "establish and maintain written procedures and flow charts defining their quality control systems(s)" and follow those written procedures and flow charts, and maintain accessible data supporting that process. FAA Advisory Circular No. 21-20B, 4/22/96.

22.    Hence, Boeing must require that its parts suppliers, such as Ducommun, perform "First Article Inspection" between the first and tenth production article [part] and that ["all activity associated with First Article Inspection will be identified and documented in accordance with applicable procedures."] *See* Boeing Quality Assurance Manual, D3-4800 @ § 5.8.2.

23.    Hence, Boeing must require that its parts suppliers, such as Ducommun, determine and measure the variation of key characteristics, and show statistical control and capability of key characteristics ["SPC data"]. *See* Boeing Document, D1-9000 @ § 2.0.

24.    Boeing must, therefore, require that its part suppliers, such as Ducommun, certify that its parts conform to quality standards imposed on it by Boeing as a condition of sale, such as the collecting of "SPC data" proving that its manufacturing process adheres to First Article Inspections, thereby creating safe parts. As such, all Boeing purchase orders to Ducommun provide that "[b]y acceptance of this order, the Seller certifies that materials/finished parts/services and/or data shall be controlled and tested in accordance with, and will meet specified order requirements and applicable specifications."

**B.      Systematic Quality/Safety Failures.**

25.      Boeing's quality program failed to ensure that its supplier, Ducommun:   (1) produced parts which conformed to approved engineering requirements; (2) that Ducommun utilized required production methods; (3) that the tools Ducommun used to produce Boeing parts were manufactured from conforming materials and conformed to quality control requirements; (4) that tools Ducommun used to produce and inspect Boeing parts were properly calibrated; (5) that Ducommun performed proper First Article Inspection, in-process and final inspections; (6) that Ducommun performed proper process and part validations, including the completing and maintenance of "SPC data"; and (7) that proper tests were performed to validate assurance.

26.      Boeing's quality program failed to prevent its own production personnel in Wichita from incorporating Ducommun parts which were improperly contoured, had shy-edge margins, had incorrectly drilled holes and/or had suspect hardness and conductivity, into aircraft delivered by Boeing to the United States government.   Boeing's quality assurance system failed to legitimately determine that the nonconforming parts were acceptable and suitable for use on the subject aircraft.   Because Boeing production personnel did not stop the use of bogus and/or nonconforming parts in Boeing aircraft, the production of defective parts by Ducommun was perpetuated.

27.      Boeing's quality program failed to timely identify the delivery of defective and nonconforming parts from Ducommun.   Moreover, once defective and nonconforming parts from Ducommun were identified by Boeing, Boeing's quality program failed to require corrective action relating to delivery to Boeing of defective parts and in some cases falsified records to allow these parts to be assembled into its aircraft, failed to disclose, notify and warn the United States.

Boeing's disposition of nonconforming parts and failure to take appropriate corrective actions violated the requirements of the FAA and Boeing's own quality control policies, procedures, and systems. Boeing has not fully disclosed to the U.S. government, or to foreign governments who purchased Boeing aircraft, that the subject aircraft were manufactured in violation of aircraft contract requirements, design specifications, type-design, and/or contain unverified parts.

**C.    Parts Supplier Ducommun.**

28.    Ducommun, at its facility in Gardena, California, manufactures several parts for Boeing--Wichita (and other divisions of Boeing including Boeing Military). These parts included, without limitation, the following, many of which are defined below:

- Bear straps
- Chords
- Fail-safe chords
- Compression chords
- Inner chords and outer chords
- Frames
- Support angle assemblies
- Splice straps, Straps
- Doublers
- Triplers
- Nose wheel well chords
- Tear straps
- Clips for the overwing panels
- Scuff Plates
- Splice Plates
- Channels
- Pressure Floor Webs
- Support Rings
- Nacelle cowl skins
- Skins (for C-17's)

29.     These parts are identified by Boeing and the U. S. Department of Defense as "flight safety critical parts" (FSCAP) indicating that they are essential to the airworthiness of the aircraft. These "flight safety critical parts" (FSCAP), manufactured beginning in at least 1994 through at least 2004 at Ducommun and delivered to, among other locations, the Boeing facility in Wichita, Kansas, were bogus and/or nonconforming and unapproved, as explained herein, for a multitude of reasons.  Boeing assembled these defective parts into aircraft fuselages and other assembly.

30.     During the relevant time period, including on the dates and times identified herein, Boeing sold or leased to the United States  government the types and numbers of aircraft with Ducommun parts listed below.

| Military Branch | Gov Model | Boeing Model | Qty | Serial Number | Delivery Date | Federal Contract Number | Suspected Quantity of Unapproved Parts |
|---|---|---|---|---|---|---|---|
| US Navy | C40-A | 737-7AFC | 1 | 29979 | Oct-00 | N00019-97-C-2034 | 113 |
| US Navy | C40-A | 737-7AFC | 1 | 29980 | Nov-00 | N00019-97-C-2034 | 113 |
| US Navy | C40-A | 737-7AFC | 1 | 30200 | Dec-00 | N00019-97-C-2034 | 113 |
| US Navy | C40-A | 737-7AFC | 1 | 30781 | Mar-01 | N00019-01-C-0071 | 113 |
| US Navy | C40-A | 737-7AFC | 1 | 32597 | Feb-02 | | 113 |
| US Navy | C40-A | 737-7AFC | 1 | 32598 | July-02 | N00019-00-C-0299 | 113 |
| US Navy | C40-A | 737-7AFC | 1 | 33826 | Aug-04 | N00019-01-C-0071 | 113 |
| US Navy | C40-A | 737-7AFC | 1 | 33836 | Nov-04 | N00019-01-C-0071 | 113 |
| US Navy | C40-A | 737-7AFC | 1 | 34304 | Jan-06 | N00019-01-C-0071 | 113 |
| US Navy | C40-B | 737-6Z9 | 1 | 30137 | Dec-03 | | 80 |
| US Air Force | C40-B | 737-6Z9 | 1 | 30138 | Feb-02 | F33657-00-C-0056 | 80 |
| US Air Force (BBJ) | C40-C | 737-7CP | 1 | 30753 | Sep-02 | F33657-01-D-0013 | 80 |
| US Air Force (BBJ) | C40-C | 737-7CP | 1 | 30755 | Sep-02 | F33657-01-D-0013 | 80 |
| US Air Force (BBJ) | C40-B/C | 737-7AN | 1 | 29971 | Dec-02 | F33657-01-D-0013 | 80 |
| US Air Force (BBJ) | C40-B/C | 737-7DM | 1 | 32916 | Jan-03 | F33657-01-D-0013 | 80 |
| US Air Force (BBJ) | C40-B/C | 737-7DM | 1 | 33080 | Jun-05 | F33657-01-D-0013 | 80 |
| US Air Force (BBJ) | C40-B/C | 737-7BC | 1 | 33434 | Jan-04 | F33657-01-D-0013 | 80 |
| US Air Force (BBJ) | C40-B/C | 737-7FD | 1 | 33500 | Jun-04 | F33657-01-D-0013 | 80 |
| US Air Force | C33 | 747-4G4F | 1 | 30201 | Jan-00 | * W/H SR | 6 |
| US Air Force | C32-A | 757-2G4 | 1 | 29025 | Jun-98 | F33657-96-C-0024 | 39 |
| US Air Force | C32-A | 757-2G4 | 1 | 29026 | May-98 | F33657-96-C-0024 | 39 |
| US Air Force | C32-A | 757-2G4 | 1 | 29027 | Nov-98 | F33657-96-C-0024 | 39 |

| US Air Force | C32-A | 757-2G4 | 1 | 29028 | Nov-98 | F33657-96-C-0024 | 39 |
| US Air Force | C32-A | 757-23A | 1 | 25493 | Feb-04 | * W/H SR | 39 |
| US Air Force | C32-A | 757-23A | 1 | 25495 | Nov-00 | * W/H SR | 39 |
| US Air Force | AWACS | 767-27C | 1 | 27385 | Oct-98 | F19628-94-C-0004 | 25 |
| US Air Force | AWACS | 767-27C | 1 | 27391 | Mar-99 | F19628-94-C-0004 | 25 |
| US Air Force | AWACS | 767-27C | 1 | 28016 | Jul-99 | F19628-94-C-0004 | 25 |
| US Air Force | AWACS | 767-27C | 1 | 28017 | Aug-99 | F19628-94-C-0004 | 25 |
| **Total** | | | **29** | | | | **2077** |

* Withheld for Security Reasons

31.     During the relevant time period, including on the dates and times identified herein, Boeing sold or leased to the militaries and/or governments of foreign countries, pursuant to the Foreign Military Sales program of the United States, the types and numbers of aircraft with Ducommun parts listed below.

| **Foreign Government** | **Boeing Model** | **Qty** | **Serial Number** | **Delivery Date** | **Suspected Quantity of Unapproved Parts** |
|---|---|---|---|---|---|
| Australian Defense (W) | 737-7DF | 1 | 30790 | Jul-00 | 113 |
| Australian Defense (W) | 737-7DT | 1 | 30829 | Nov-01 | 113 |
| Australian Defense (W) | 737-7ES | 1 | 33447 | Dec-02 | 113 |
| Australian Defense (W) | 737-7ES | 1 | 33542 | Oct-02 | 113 |
| Australian Defense (W) | 737-7ES | 1 | 33962 | Dec-04 | 113 |
| Saudi Air Force | 737-8DP | 1 | 32451 | Feb-03 | 113 |
| Saudi Air Force | 737-7DP | 1 | 32805 | Jul-04 | 113 |
| United Arab Emirates Gov | 737-78EX | 1 | 33473 | Jun-03 | 113 |
| Equatorial Guinea Gov | 737-7FB | 1 | 33367 | Sep-03 | 113 |
| Jordanian Government | 737-7BC | 1 | 30884 | Apr-01 | 113 |
| Pakistan Government | 737-7N6 | 1 | 34260 | Feb-02 | 113 |
| Royal Malaysian Air Force | 737-7H6 | 1 | 29274 | Jun-03 | 113 |
| South African Air Force | 737-7ED | 1 | 32627 | Jun-01 | 113 |
| Taiwan Air Force | 737-8AR | 1 | 30139 | Dec-99 | 113 |
| Yemen Government | 747SP27 | 1 | 21789 | Nov-00 | 6 |
| Italian Air Force | 767-2EY | 1 | 33686 | Oct-03 | 25 |
| Kazakhstan Government | 767-2DX | 1 | 32954 | Feb-02 | 25 |
| **Total** | | **17** | | | **1638** |

32.    By reason of the previously described quality assurance deficiencies, the above listed commercial aircraft, together with all other aircraft sold by Boeing which incorporate Ducommun parts during the relevant time period, including on the dates and times identified herein, **(such as Boeing's military aircraft)**, did not conform to: (1) contract requirements, to include mandatory drawings from which deviation is not permitted; (2) U.S. Military specifications, where applicable; and (3) Federal Aviation Administration (FAA) requirements. Thus, because of the violations and nonconformities identified herein, the parts identified in the charts at Paragraphs 30 and 31 are unairworthy and did not comply with all requirements of Boeing's aircraft contracts with the U.S. government. All claims for payment submitted by Boeing to the U.S. government for these aircraft were false claims for payment.

33.    All claims for payment submitted by Boeing to the U.S. government were knowingly false because Boeing actually knew, recklessly disregarded or deliberately ignored the fact that the flight-critical subject parts were made in violation of contract terms, design specifications, type-design, and other such requirements.

34.    In addition to its lack of quality assurance functions, Ducommun also had nonconformance issues with its tooling. "Tooling," in the aircraft context, refers to large and small fixtured jigs and other pieces which are used to enable the precision cutting, trimming, bending, shaping, milling, and drilling of finished parts. If aircraft tooling is improperly designed or built or if it is used in a manner not contemplated by its design, then parts which conform to the engineering drawings cannot be produced.

35.    With regard to the specific parts manufactured for Boeing by Ducommun, bear straps are fuselage components which surround and support doorways. They are a particular form

of doubler (*see infra)* used to strengthen and add support to the area around the galley, entry and cargo doors. They are critical to airworthiness of aircraft by transferring stress loads to other parts of the fuselage. All bear straps delivered by Ducommun for the 737-NG, at least through 2004, were physically nonconforming because of shy-edge margins (which weakens the structural integrity of the part per engineering requirements) and/or by virtue of the lack of statistical process control data and improper/inadequate and nonexistent inspection.

36.    Chords are airframe members which act as the "ribs" of the fuselage. Chords are arrayed radially around the contour of an aircraft. "Fail-safe chords", defined as those which are designed such that the failure of any single such part will not result in catastrophic failure of the aircraft, are reinforced chords which are designed for particular locations on the airframe. All chords delivered by Ducommun for the 737-NG series are physically nonconforming by virtue of having shy-edge margins, mislocated "ATA" holes, being out of contour per engineering requirements, lack of statistical process control data and/or improper/inadequate and nonexistent inspections (including First Article Inspections).

37.    Frames are major structural fuselage components. Frames are joined to chords and stringers and their assemblage forms the structure of the airframe. The airframe in turn supports the fuselage skin assemblies which are riveted to the stringers and chords. All frames delivered by Ducommun, at least until 2004, were physically nonconforming by virtue of the lack of statistical process control data and/or improper/inadequate and nonexistent inspections.

38.    Doublers, triplers, splice straps, tear straps, and splice plates are precision manufactured parts which are bonded and/or fastened to the skin of an airplane at locations where additional thickness is required to distribute the structural load especially where the fuselage

sections join together.  They are used to support the attaching of stringers, chords and fittings.  All of these components delivered by Ducommun, at least until 2004, were physically nonconforming by virtue of the lack of statistical process control data and/or improper, inadequate and/or nonexistent inspections.

39.     When doublers and triplers are not properly manufactured, one of the problems that arises is a "shy-edge" margin.  In these circumstances, the doubler or tripler fasteners ride too closely to the edge of the skin material.  Failure of the skins would create a loss of cabin pressure and the known risk of the skin coming off of the aircraft.

40.     By virtue of their place in the airframe, frames, straps, plates, doublers, triplers, chords, and bear straps are completely hidden from view and from noninvasive inspection after the aircraft is assembled.

41.     Failure of any of these components compromise the structural integrity of the aircraft and would weaken other aircraft components such as the skin with potentially disastrous results.  Any chord, frame, or channel that is out of contour would, by necessity, be forced into place during assembly causing  pre- stress to the part.  Straps, doublers, triplers, or chords with shy edge margins bring about the situation, a known risk, that rivets could pull loose.  Where any of the aforementioned parts are not heat treated according to the requisite specifications, these parts could break or tear depending on the stresses caused by the pre-stress conditions, could tear loose from other parts due to rivets chafing in oversized and/or misaligned holes, could cause payload stresses during take-off and landing, and deteriorate, break apart or tear in many other scenarios.

D.     **Defendants' Multiple Contractual and Regulatory Obligations and Misrepresentations**

42.     Defendants provided the subject aircraft to the U.S. government and/or military pursuant to contractual agreements that required full and complete compliance with, among others: Defendants' internal commercial policies, procedures, standards, and disciplines for quality, management, documentation, and verification; Federal Aviation Regulations (FAR); Industry Aerospace Standards (AS); the Code of Federal Regulations (CFR); the International Organization for Standardization (ISO); Department of Defense Handbook on Airworthiness Certification Criteria (MIL-HDBK-516A); the Joint Service Specification Guide (JSSG 2006); the Federal Aviation Administration Advisory Circular AC 21-1B (Circular); and good manufacturing processes.

**Defendants' Contracts and Contractual Obligations for Specific Planes in Question**

43.     On August 29, 1999, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. N00019-97-C-2034) to deliver a 737-7AFC (C40-A Air vehicle) to the Navy for $55,527,500.00. This aircraft was assigned Serial Number 29979.  It was delivered to the U.S. government in October 2000 pursuant to the contract and its terms of payment.

a.     Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (N00019-97-C-2034).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-

numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

44.     On August 29, 1997, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No.

N00019-97-C-2034) to deliver a 737-7AFC (C40-A Air vehicle) to the Navy for $55,527,500.00. This aircraft was assigned Serial Number 29980. It was delivered to the U.S. government in November 2000 pursuant to the contract and its terms of payment.

a.    Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212. Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (N00019-97-C-2034). After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft. This certificate is required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.    Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

45.     On July 30, 1999, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. N00019-97-C-2034) to deliver a 737-7AFC (C40-A Air vehicle) to the Navy for $43,700,000.00. This aircraft was assigned Serial Number 30200.  It was delivered to the U.S. government in December 2000 pursuant to the contract and its terms of payment.

a.      Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (N00019-97-C-2034).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

46.     On December 28, 2000, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. N00019-01-C-0071) to deliver a 737-7AFC (C40-A Air vehicle) to the Navy for $52,764.043.00. This aircraft was assigned Serial Number 30781.  It was delivered to the U.S. government in March 2001 pursuant to the contract and its terms of payment.

a.      Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (N00019-01-C-0071).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments

for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

47.    On or about June 5, 2000, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract to deliver a 737-7AFC (C40-A Air vehicle) to the Navy for $53,793,122.00.  This aircraft was assigned Serial Number 32597.  It was delivered to the U.S. government in February 2002 pursuant to the contract and its terms of payment.

a.    Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had

manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

      c.     Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

      d.     These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous. The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members. As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

      48.     On or about June 5, 2000, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. N00019-00-C-0299) to deliver a 737-7AFC (C40-A Air vehicle) to the Navy for $53,793,122.00. This aircraft was assigned Serial Number 32598. It was delivered to the U.S. government in July 2002 pursuant to the contract and its terms of payment.

      a.     Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212. Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (N00019-00-C-0299). After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this

serial numbered aircraft. This certificate is required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous. The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members. As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

49.     On March 27, 2003, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. N00019-01-C-0071) to deliver a 737-7AFC (C40-A Air vehicle) to the Navy for $61,000,000.00. This aircraft was assigned Serial Number 33826.  It was delivered to the U.S. government in August 2004 pursuant to the contract and its terms of payment.

        a.      Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (N00019-01-C-0071).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

        b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

        c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and

8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

      d.     These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

50.    On November 21, 2003, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. N00019-01-C-0071) to deliver a 737-7AFC (C40-A Air vehicle) to the Navy for $62,000,000.00. This aircraft was assigned Serial Number 33836.  It was delivered to the U.S. government in November 2004 pursuant to the contract and its terms of payment.

      a.     Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (N00019-01-C-0071).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the

Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

51.     On December 6, 2004, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. N00019-01-C-0071) to deliver a 737-7AFC (C40-A Air vehicle) to the Navy for $63,250,000.00.

This aircraft was assigned Serial Number 34304. It was delivered to the U.S. government in January 2006 pursuant to the contract and its terms of payment.

a.    Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212. Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (N00019-01-C-0071). After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft. This certificate is required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.    Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.    These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were

nonairworthy and potentially dangerous.    The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.    As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

52.    On or about July 30, 1999, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract to deliver a 737-6Z9 (C-0- B Air vehicle) to the Navy for $62,164,513.00.    This aircraft was assigned Serial Number 30137.    It was delivered to the U.S. government in December 2003 pursuant to the contract and its terms of payment.

a.    Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.    Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.    After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.    This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The

Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

      c.    Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

      d.    These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous. The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members. As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

53.    On October 17, 2000, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. F33657-00-C-0056) to deliver a 737-6Z9 (C40-B Air vehicle) to the Air Force for $62,164,513.00. This aircraft was assigned Serial Number 30138. It was delivered to the U.S. government in February 2002 pursuant to the contract and its terms of payment.

      a.    Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212. Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the

contract (F33657-00-C-0056).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

      b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

      c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

      d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor

costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

54.     On February 9, 2001, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. F33657-01-D-0013) to deliver a 737-7CP (C40-C Air vehicle) to the Air Force for $105,792,428.00.  This aircraft was assigned Serial Number 30753.  It was delivered to the U.S. government in September 2002 pursuant to the contract and its terms of payment.

        a.     Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (F33657-01-D-0013).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

        b.     Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.   The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.   As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

55.     On February 9, 2001, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. F33657-01-D-0013) to deliver a 737-7CP (C40-C Air vehicle) to the Air Force for $105,792,428.00.  This aircraft was assigned Serial Number 30755.  It was delivered to the U.S. government in September 2002 pursuant to the contract and its terms of payment.

a.      Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (F33657-01-D-0013).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-

numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.    Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.    These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

56.    On February 9, 2001, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No.

F33657-01-D-0013) to deliver a 737-7AN (C40-B/C Air vehicle) to the Air Force for $105,792,428.00.  This aircraft was assigned Serial Number 29971.  It was delivered to the U.S. government in December 2002 pursuant to the contract and its terms of payment.

      a.    Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (F33657-01-D-0013).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

      b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

      c.    Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous. The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members. As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

57.     On February 9, 2001, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. F33657-01-D-0013) to deliver a 737-7DM (C40-B/C Air vehicle) to the Air Force for $105,792,428.00. This aircraft was assigned Serial Number 32916. It was delivered to the U.S. government in January 2003 pursuant to the contract and its terms of payment.

a.      Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212. Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (F33657-01-D-0013). After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft. This certificate is required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

58.     On February 9, 2001, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. F33657-01-D-0013) to deliver a 737-7DM (C40-B/C Air vehicle) to the Air Force for $105,792,428.00.  This aircraft was assigned Serial Number 33080.  It was delivered to the U.S. government in June 2005 pursuant to the contract and its terms of payment.

a.      Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (F33657-01-D-0013).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments

for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

59.    On February 9, 2001, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. F33657-01-D-0013) to deliver a 737-7BC (C40-B/C Air vehicle) to the Air Force for $105,792,428.00.  This aircraft was assigned Serial Number 33434.  It was delivered to the U.S. government in January 2004 pursuant to the contract and its terms of payment.

a.    Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (F33657-01-D-0013).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had

manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

      c.     Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

      d.     These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous. The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members. As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

60.     On February 9, 2001, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. F33657-01-D-0013) to deliver a 737-7FD (C40-B/C Air vehicle) to the Air Force for $105,792,428.00. This aircraft was assigned Serial Number 33500. It was delivered to the U.S. government in June 2004 pursuant to the contract and its terms of payment.

      a.     Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212. Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (F33657-01-D-0013). After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this

serial numbered aircraft. This certificate is required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous. The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members. As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

61.     The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. withheld for security reasons) to deliver a 747-FG4F (C33 Air vehicle) to the Air Force for $223,200,000.00.  This aircraft was assigned Serial Number 30201.  It was delivered to the U.S. government in January 2000 pursuant to the contract and its terms of payment.

a.     Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A20WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.     Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.     Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and

8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

   d. These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous. The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members. As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

   62. On August 8, 1996, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. F33657-96-C-0024) to deliver a 757-2G4 (C32-A Air vehicle) to the Air Force for $91,366,882.00. This aircraft was assigned Serial Number 29025. It was delivered to the U.S. government in June 1998 pursuant to the contract and its terms of payment.

   a. Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212. Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (F33657-96-C-0024). After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A2NM so as to be allowed to manufacture this serial numbered aircraft. This certificate is required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the

Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.     Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.     Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.     These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

63.     On August 8, 1996, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. F33657-96-C-0024) to deliver a 757-2G4 (C32-A Air vehicle) to the Air Force for $91,366,882.00.  This

aircraft was assigned Serial Number 29026.  It was delivered to the U.S. government in May 1998 pursuant to the contract and its terms of payment.

      a.      Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (F33657-96-C-0024).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A2NM so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

      b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

      c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

      d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were

nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

64.    On August 8, 1996, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. F33657-96-C-0024) to deliver a 757-2G4 (C32-A Air vehicle) to the Air Force for $91,366,882.00.  This aircraft was assigned Serial Number 29027.  It was delivered to the U.S. government in November 1998 pursuant to the contract and its terms of payment.

a.    Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (F33657-96-C-0024).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A2NM so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The

Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.     Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.     These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

65.     On August 8, 1996, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. F33657-96-C-0024) to deliver a 757-2G4 (C32-A Air vehicle) to the Air Force for $91,366,882.00.  This aircraft was assigned Serial Number 29028.  It was delivered to the U.S. government in November 1998 pursuant to the contract and its terms of payment.

a.     Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the

contract (F33657-96-C-0024).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A2NM so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

      b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

      c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

      d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor

costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

66.    The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. withheld for security reasons) to deliver a 757-23A (C32-A Air vehicle) to the Air Force for $91,366,882.00.  This aircraft was assigned Serial Number 25493.  It was delivered to the U.S. government in February 2004 pursuant to the contract and its terms of payment.

a.    Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A2NM so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

67.     The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. withheld for security reasons) to deliver a 757-23A (C32-A Air vehicle) to the Air Force for $91,366,882.00.  This aircraft was assigned Serial Number 25495.  It was delivered to the U.S. government in November 2000 pursuant to the contract and its terms of payment.

a.      Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A2NM so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft

met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

68.    On October 12, 1994, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. F19628-94-C-

0004) to deliver a 767-27C (AWACS Air vehicle) to the Air Force for $260,600,000.00. This aircraft was assigned Serial Number 27385. It was delivered to the U.S. government in October 1998 pursuant to the contract and its terms of payment.

      a.     Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212. Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (F19628-94-C-0004). After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A1NM so as to be allowed to manufacture this serial numbered aircraft. This certificate is required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

      b.     Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

      c.     Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

69.     On October 12, 1994, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. F19628-94-C-0004) to deliver a 767-27C (AWACS Air vehicle) to the Air Force for $260,600,000.00.  This aircraft was assigned Serial Number 27391.  It was delivered to the U.S. government in March 1999 pursuant to the contract and its terms of payment.

a.      Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (F19628-94-C-0004).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A1NM so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

70.      On or about October 12, 1994, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. F19628-94-C-0004) to deliver a 767-27C (AWACS Air vehicle) to the Air Force for $260,600,000.00.  This aircraft was assigned Serial Number 28016.  It was delivered to the U.S. government in July 1999 pursuant to the contract and its terms of payment.

a.      Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (F19628-94-C-0004).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A1NM so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments

for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

71.    On or about October 12, 1994, The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract (Federal Contract No. F19628-94-C-0004) to deliver a 767-27C (AWACS Air vehicle) to the Air Force for $260,600,000.00.  This aircraft was assigned Serial Number 28017.  It was delivered to the U.S. government in August 1999 pursuant to the contract and its terms of payment.

a.    Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract (F19628-94-C-0004).  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A1NM so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had

manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

      c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

      d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous. The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members. As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

      72.      The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 737-7DF to the U.S. government for transfer to Australian Defense. This aircraft was assigned Serial Number 30790. It was delivered to the U.S. government in July 2000 pursuant to the contract and its terms of payment.

      a.      Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212. Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract. After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered

aircraft. This certificate is required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous. The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members. As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

73.    The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 737-7DT to the U.S. government for transfer to Australian Defense.  This aircraft was assigned Serial Number 30829.  It was delivered to the U.S. government in November 2001 pursuant to the contract and its terms of payment.

a.    Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.    Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and

8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

       d.     These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

74.     The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 737-7ES to the U.S. government for transfer to Australian Defense.  This aircraft was assigned Serial Number 33447.  It was delivered to the U.S. government in December 2002 pursuant to the contract and its terms of payment.

       a.     Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The

Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

75.     The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 737-7ES to the U.S. government for transfer to Australian Defense.  This aircraft was assigned

Serial Number 33542.  It was delivered to the U.S. government in October 2002 pursuant to the contract and its terms of payment.

        a.      Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

        b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

        c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

        d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were

nonairworthy and potentially dangerous. The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members. As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

76.     The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 737-7ES to the U.S. government for transfer to Australian Defense. This aircraft was assigned Serial Number 33962. It was delivered to the U.S. government in December 2004 pursuant to the contract and its terms of payment.

a.     Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212. Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract. After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft. This certificate is required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.     Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The

Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.    Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.    These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

77.    The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 737-8DP to the U.S. government for transfer to Saudi Air Force.  This aircraft was assigned Serial Number 32451.  It was delivered to the U.S. government in February 2003 pursuant to the contract and its terms of payment.

a.    Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the

contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.     Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.     Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.     These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor

costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

78.     The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 737-7DP to the U.S. government for transfer to Saudi Air Force.  This aircraft was assigned Serial Number 32805.  It was delivered to the U.S. government in July 2004 pursuant to the contract and its terms of payment.

a.     Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.     Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

     c.     Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

     d.     These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

79.     The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 737-78EX to the U.S. government for transfer to United Arab Emirates.  This aircraft was assigned Serial Number 33473.  It was delivered to the U.S. government in June 2003 pursuant to the contract and its terms of payment.

     a.     Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft

met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.    Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.    These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous. The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members. As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

80.    The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a

737-7FB to the U.S. government for transfer to Equatorial Guinea. This aircraft was assigned Serial Number 33367. It was delivered to the U.S. government in September 2003 pursuant to the contract and its terms of payment.

        a.    Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212. Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract. After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft. This certificate is required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

        b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

        c.    Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

       d.       These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous. The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members. As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

81.     The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 737-7BC to the U.S. government for transfer to Jordan. This aircraft was assigned Serial Number 30884. It was delivered to the U.S. government in April 2001 pursuant to the contract and its terms of payment.

       a.       Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212. Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract. After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft. This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

82.     The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 737-7N6 to the U.S. government for transfer to Pakistan.  This aircraft was assigned Serial Number 34260.  It was delivered to the U.S. government in February 2002 pursuant to the contract and its terms of payment.

a.      Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments

for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

83.    The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 737-7H6 to the U.S. government for transfer to the Royal Malaysian Air Force.  This aircraft was assigned Serial Number 29274.  It was delivered to the U.S. government in June 2003 pursuant to the contract and its terms of payment.

a.    Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had

manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

84.     The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 737-7ED to the U.S. government for transfer to the South African Air Force.  This aircraft was assigned Serial Number 32627.  It was delivered to the U.S. government in June 2001 pursuant to the contract and its terms of payment.

a.      Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered

aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

      b.     Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

      c.     Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

      d.     These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

85.    The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 737-8AR to the U.S. government for transfer to the Taiwan Air Force.  This aircraft was assigned Serial Number 30139.  It was delivered to the U.S. government in December 1999 pursuant to the contract and its terms of payment.

a.    Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A16WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.    Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and

8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

   d. These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

   86. The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 747SP27 to the U.S. government for transfer to the Yemen Air Force.  This aircraft was assigned Serial Number 21789.  It was delivered to the U.S. government in November 2000 pursuant to the contract and its terms of payment.

   a. Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A20WE so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein. When Boeing delivered the aircraft to the US government together with the Certificate, The

Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.    Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.    Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.    These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

87.    The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 767-2EY to the U.S. government for transfer to the Italian Air Force.  This aircraft was assigned

Serial Number 33686.  It was delivered to the U.S. government in October 2003 pursuant to the contract and its terms of payment.

        a.      Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A1NM so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

        b.      Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

        c.      Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

        d.      These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were

nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

88.     The Boeing Company, P.O. Box 3707, Seattle, Washington, under Military Supplier No. 4C-53, entered into a contract under the Foreign Military Sales Program to deliver a 767-2DX to the U.S. government for transfer to Kazakhstan Government.  This aircraft was assigned Serial Number 32954.  It was delivered to the U.S. government in February 2002 pursuant to the contract and its terms of payment.

a.     Boeing's Contract Manager signed the contract on behalf of The Boeing Company on Standard Form 1449 as prescribed by FAR 53.212.  Attached to the Form 1449 are the specific contractual provisions which, together with Form 1449, make up the contract.  After entering into this contract with the U.S. government, Boeing revised its Type Data Certificate A1NM so as to be allowed to manufacture this serial numbered aircraft.  This certificate is  required by the contract to serve as evidence of completion for verification of completion of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein.  When Boeing delivered the aircraft to the US government together with the Certificate, The Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph 97.

b.     Along with the delivered aircraft, Boeing provided the U.S. government a Certificate of Airworthiness (FAA Form 8130-6), which was materially false in that The

Boeing Company fraudulently certified that Boeing had complied with contract specifications, and by implying that Boeing and its suppliers (including Ducommun) had manufactured the component parts, and the aircraft itself, in accordance with type design, Boeing falsified Sections III.B, IV.A.5, and VIII.G of the Certificate of Airworthiness.

c.    Along with the Certificate of Airworthiness, The Boeing Company also provided the U.S. government a Statement of Conformity (FAA Forms 8130-2 and 8130-9), which fraudulently omitted in its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.

d.    These false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous.  The Boeing Company sold these potentially dangerous and nonairworthy aircraft to the United States military and foreign governments for use by their respective members.  As a result, the aircraft requires additional and more frequent inspections and repairs (resulting in unexpected and unforeseen aircraft out-of-service/downtime/loss of use, increased operational costs, increased material and labor costs, and other economic and financial losses), and further culminating in a diminution in the value of the aircraft by a substantial percentage of its market and economic value.

89.    Among the contract provisions referenced above in paragraphs 43-88, are the following, in which The Boeing Company (and its supplier Ducommun) presented false or fraudulent claims for payments or approval by warranting compliance it (and its supplier Ducommun) could not provide:

a.    "The contractor shall have total system integration and performance responsibility to design, produce and test the [aircraft] in order to qualify the system, including Federal Aviation Administration certification for the complete aircraft including

any equipment and modifications necessary to meet the requirements of the applicable documents for [the aircraft] and this statement of work."

b.    "The contractor shall provide complete air vehicles as defined by the contract (including FAA certification) as set forth [in the Statement of Work] and the applicable documents for [the aircraft] addenda to FAR 52.212.4."

c.    "The contractor shall conduct an FAA certification program on the first article aircraft in accordance with standard commercial practices.  Modifications required to meet [the aircraft] requirements shall be in compliance with the U.S. Federal Aviation Administration Requirements (FAR) except where specifically waived by the USAF.  The aircraft shall be certified in accordance with 14 CFR Part 25.  The contractor shall provide a letter signed by the FAA stating that the [aircraft] meets the equivalent levels of safety for Part 25 Amendments 58, 59, 60, 61, 65, 66, 74, 76, 80, 82 and 83."

d.    "The contractor shall utilize its commercial configuration management program."

e.    "The contractor shall record and report the status of changes to the air vehicle configuration and its documentation in accordance with standard commercial practices."

f.    "The contractor shall provide a copy of the type certificate, and FAA Form 8130-2 (to document all variations from the FAA certified type design), and any other FAA documentation as appropriate at the configuration review.  The FAA form 8130-2 statement of conformity may be used to satisfy the requirements of the configuration review where appropriate."

**Defendants' Promotional Misrepresentations**

90.    Ducommun fraudulently touted, misrepresented, and falsely promoted and

disseminated to the public, industry, and others that "Each Ducommun AeroStructures facility has implemented a quality system that meets or exceeds the standards established for the aerospace industry within the United States as well as internationally...Our quality systems are based on ISO and AS standards, currently recognized around the world."

91.     Ducommun fraudulently touted, misrepresented, and falsely promoted and disseminated to the public, industry, and others that "Ducommun AeroStructures has upgraded our Quality Management System (QMS) to meet or exceed the requirements of SAE AS 9100A and ISO 9001:2000."

92.     Boeing fraudulently touted, misrepresented, and falsely promoted and disseminated to the public, industry, and others that it required its suppliers to adhere to AS 9100 Quality Management standards.

93.     Boeing fraudulently touted, misrepresented, and falsely promoted and disseminated to the public, industry, and others that it and its suppliers adhered to ISO 9001 standards.

**Defendants' Failure to Comply with the Code of Federal Regulations**

94.     Defendants were obligated and failed to comply with, among others, 14 C.F.R. Part 3 "General Requirements" and 14 C.F.R. Part 21, which provide as follows (see Complaint paragraphs herein at 2, 4, 20, 21, 23, 24, 25, 26, 27, 32, 35, 36, 38, 108, 111, 112, 116, 118, 120, 121, 122, 124, 126, 127, 132, 134, 135, 137, 138, 139, 140, 141, 143, 144, 145, 147, 148, 151, 152):

> a.  14 C.F.R. Part 3.1
>> 3.1  Applicability
>>> (a)  This part applies to any person who makes a record regarding:
>>>> (1) A type-certified product, or

                (2) A product, part, appliance or material that may be used on a type-certified product.

b.  14 C.F.R. Part 3.5

    3.5  Statements about products, parts, appliances and materials

        ***

        (b)   Prohibition against fraudulent and intentionally false statement.   When conveying information related to an advertisement or sales transaction, no person may make or cause to be made:

            (1) Any fraudulent or intentionally false statement in any record about the airworthiness of a type-certified product, or the acceptability of any product, part, appliance or material for installation on a type-certified product.

            ****

c.  14 C.F.R. Part 21.3

    § 21.3 Reporting of failures, malfunctions, and defects.

        ***

        (b) The holder of a Type Certificate (including a Supplemental Type Certificate), a Parts Manufacturer Approval (PMA), or a TSO authorization, or the licensee of a Type of Certificate shall report any defect in any product, part, or article manufactured by it that has left its quality control system and that it determines could result in any of the occurrences listed in paragraph (c) of this section.

        (c) The following occurrences must be reported as provided in paragraphs (a) and (b) of this section: ***

            (8) A significant aircraft primary structural defect or failure caused by any autogenous condition (fatigue, understrength, corrosion, etc.).

d.  14 C.F.R. Part 21.139

    § 21.139 Quality control.

    The applicant must show that he has established and can maintain a quality control system for any product, for which he requests a production certificate, so that each article will meet the design provisions of the pertinent type certificate.

e.  14 C.F.R. Part 21.165

    § 21.165 Responsibility of holder.

    The holder of a production certificate shall—

(a) Maintain the quality control system in conformity with the data and procedures approved for the production certificate; and

(b) Determine that each part and each completed product, including primary category aircraft assembled under a production certificate by another person from a kit provided by the holder of the production certificate, submitted for airworthiness certification or approval conforms to the approved design and is in a condition for safe operation.

f.  14 C.F.R. Part 21.607

§ 21.607 General rules governing holders of TSO authorizations.

Each manufacturer of an article for which a TSO authorization has been issued under this part shall—

(a) Manufacture the article in accordance with this part and the applicable TSO;

(b) Conduct all required tests and inspections and establish and maintain a quality control system adequate to ensure that the article meets the requirements of paragraph (a) of this section and is in condition for safe operation;

****

g.  14 C.F.R. Part 25.601

§ 25.601 General.

The airplane may not have design features or details that experience has shown to be hazardous or unreliable. The suitability of each questionable design detail and part must be established by tests.

h.  14 C.F.R. Part 25.605

§ 25.605 Fabrication methods.

(a) The methods of fabrication used must produce a consistently sound structure.  If a fabrication process (such as gluing, spot welding, or heat treating) requires close control to reach this objective, the process must be performed under an approved process specification.

(b) Each new aircraft fabrication method must be substantiated by a test program.

**Defendants' Failure to Conform to the Department of Defense Handbook on Airworthiness Certification Criteria**

95.    Department of Defense Handbook, Airworthiness Certification Criteria

(MIL-HDBK-516A), provides guidance for the manufacture and sale of the aircraft at issue. Upon information and belief, these guidelines were incorporated into the contracts as required specifications for structural performance and verification of the airframes of the subject aircraft. Defendants failed to conform with section 4.4 "Manufacturing, support, and quality," which provides (see Complaint paragraphs herein at 4, 24 ,25, 35, 36, 37, 38, 110, 123, 139, 141, 146, 148, 151, 152):

> 4.4.3 Verify that all critical quality standards exist to meet key product characteristic requirements.

**Defendants' Failure to Conform to the Joint Service Specification Guide**

96.     Joint Service Specification Guide (JSSG 2006) provides guidance for the manufacture and sale of the aircraft at issue. Upon information and belief, these guidelines were incorporated into the contracts as required specifications for structural performance and verification of the airframes of the subject aircraft. Defendants failed to conform to, including, but not limited to, certain JSSG 2006 provisions on "Requirements," "Verification," and "Notes," including but not limited to the following (see Complaint paragraphs herein at 35, 36, 37, 38, 39, 40, 41, 119, 122, 125, 128, 133, 134, 135, 136, 138, 144, 145, 148, 151, 152):

> a. 3.2.19 Materials and processes.
> Materials and processes shall be selected in accordance with the following requirements so that the airframe meets the operational and support requirements.
>> a. Relevant producibility, maintainability, supportablilty, repairability, and availability experience with the same, or similar, materials processes shall be a governing factor for suitability of the airframe design. Environmentally conditioned tests must be performed at the appropriate development test level to meet relevant design conditions.
>> b. Material systems and materials processes selected for design shall be stable, remain fixed, and minimize unique

maintenance and repair practices in accordance with the specified operational and support concepts.

c. Material systems and materials processes (including radioactive materials and processes) shall be environmentally compliant, compliant with best occupational safety and health practices, and minimize hazardous waste generation.

b. 3.3.17 Rapid decompression.

The safety of flight structure shall possess in-flight evident residual strength (3.12.2) to withstand rapid decompressions from which recovery is expected. If the pressurized structure has several compartments separated by partitions, bulkheads, floors, or combinations thereof, the safety of flight portions of the structure shall withstand the pressure differential caused by the sudden release of pressure in any compartment during any approved operating or maintenance usage of the air vehicle. Venting and other means of controlling the differential pressure between compartments is permitted. The structure, including nonstructural compartment bulkheads, wall and ceiling panels, doors, etc., shall not cause injury to properly restrained personnel within the compartments. The probable size, shape, and location of the opening that causes sudden decompression shall be rationally established. Such failures shall not degrade, damage, or cause to fail any other components of the flight control, fuel, hydraulic, or electrical systems, such that safe, continued, and controlled flight is in question. Sources of openings shall include:

a. All openings that result from system failures defined in 3.2.22.

b. Subcritical cracks or arrested critical cracks originating from fatigue or induced flaws.

c. The following occurrences and any others considering the operational experience of similar air vehicles performing similar missions:

(1) Bird strikes.

(2) The largest portions of any engine or propeller following disintegration.

(3) Failure of other subsystems.

d. Other.

c. 4.2.19 Materials and processes.

Inspections, analyses, and tests shall verify that the materials and processes selected are in compliance with the requirements of 3.2.19. The following requirements also apply:

a. Materials and processes development and characterization and the selection process must be documented. Second source materials (when established as a program requirement) must be qualified and demonstrated through testing to have equivalent performance and fabrication characteristics as the selected baseline material.

b. Materials and processes characteristics for critical parts (see definitions in 6.1.23) shall comply with the requirements of the parts control processes as specified in 3.13.

c. Environmental compliance with all applicable environmental statutes and laws for all materials systems and processes selected must be verified. This shall include life cycle management of hazardous materials.

d. 4.16 Production facilities, capabilities, and processes.

These requirements shall be incrementally verified by examination, inspections, analyses, demonstration, and/or test. The incremental verification shall be consistent with the expectations for design maturity expected at key decision points in the program.

e. 6.1.57 Key production process.

Those production processes which control key product characteristics. This may be a fabrication process, assembly process, test process, or an inspection process.

f. 6.1.58 Process capability index (Cp).

The ratio of the design tolerance to the process variablity.

$$Cp = \frac{design\ tolerance}{process\ spread} = \frac{upper\ spec\ limit - lower\ spec\ limit}{6\ sigma\ process\ spread\ (6s)}$$

g. 6.1.59 Process performance index (Cpk).

A comparison of the variability and centering of a controlled manufacturing process with the governing design parameter and its tolerance band. It is defined as the minimum of the following two items.

(1) process mean minus the lower specification limit, all divided by half the process spread (3 sigma), or

(2) the upper specification limit minus the process mean all divided by half the process spread (3 sigma).

$$Cpk = \frac{Min[(process\ mean - lower\ spec\ limit),\ (upper\ spec\ limit - process\ mean)]}{1/2\ process\ spread\ (3s)}$$

Variables data to support this may be derived form various sources. Among these are control charts created as part of formal statistical process control (SPC) procedures, data from automated or manual inspection, automated non-destructive evaluation, or computer-generated information from machines operating under adaptive controls.

h.  6.1.62 Production process.
The basic methods required to manufacture, fabricate, assemble, and test hardware, including sub-assemblies, assemblies, components, subsystems, and systems, the associated process control technologies, and the quality assurance requirements implementation.

**Defendants' Failure to Comply with Federal Aviation Regulations (FAR)**

97.    Federal Aviation Administration (FAA) Advisory Circular (AC) AC21-13 production certificates, provides acceptable means of complying with the law. This AC contains the FAA intended application of key terms in the new statutory definition.   Where the term supplier is defined as any person who furnishes services to a holder of a production certificate which affects a type certified product, or who supplies articles for installation on a type certificates product (Ducommon).   Defendants were obligated to and failed to comply to FAA, AC21-1B as follows (see complaint paragraphs herein at 25, 26, 34, 36, 107, 124, 136, 137, 138, 139, 140, 142, 143, 145):

Par 8.  FAR 21.139- QUALITY CONTROL
A total quality control system meeting the requirements of FAR 21.139 would provide control over all phases of manufacture, including control over the manufacture of all supplier furnished articles. ****

Par 9.  FAR 21.143 QUALITY CONTROL PARTS REQUIREMENTS
***
b. In general, the requirements for FAR 21.143 are self-explanatory and the following paragraphs provide an example of acceptable compliance:
***

(5) ***

      (d) A listing of manufacturing processes which are relied upon to assurance quality, conformity and safety of the completed product.

c. A acceptable means of compliance with FAR 21.143 (b) would be to provide in the quality control data a description of the system used to evaluate, monitor and control all suppliers to whom the holder of a production certificate has delegated inspection duties for controlling conformity and quality ****

d. ***

      (2) <u>Manufacturing processes</u>.  An inspection planning system that would  provide the means for selecting and controlling procedures governing methods for:

            (a). Selection of appropriate inspection methods and plans for articles to insure that all characteristics affecting safety will be inspected as required, to ensure conformity to approved design data and to eliminate discrepancies from completed products and spare articles.

            ***

            (d). Production planning is commonly achieved through use of fabrication and inspection instructions, shop travelers, checklists, or similar media, which not only provide control over fabrication and assembly operations but also ensure that necessary inspections and tests will be conducted in the proper sequence, when articles and processes are in an inspectable condition ****

      (4). <u>Inspection/Identification</u>.  Identifying articles or controlling documentation with appropriate stamps or marks traceable to individual inspector, is a means of ensuring that only those articles and processes which have been accepted and found to conform to FAA approved design data are used in the product.

      ***

      (6) Tool and gauges control

            (a)  Adequate manufacturing facilities, equipment and tooling would have the capability and reliability to ensure production of uniform duplicate articles and products conforming to the approved type design data.

            (b)  To preclude acceptance of nonconforming articles or rejections due to improperly controlled tools and gauges, a quality control system should incorporate a schedule for inspection and calibration, to certified national measurement standard of all inspection tools, gauges and testing equipment, as well as production jigs, fixtures, templates, etc., which are

depended upon as media or inspection.  An acceptable schedule would have the inspection intervals established on the basis that such tool and gauges would be inspected prior to their becoming inaccurate, or requiring adjustment, replacement or repair. ****

(7.) Supplier Control.  The holder of a production certificate is primarily responsible under the requirements of FAR 21.165 for each article used in his product; therefore, he should establish a system to ensure conformity to the type design of all articles or services obtained from suppliers.  Such a system would ensure that: ***

(d)  Suppliers to the holder of a production certificate would formally advise that their facilities system, data, equipment, personnel and articles being supplied are subject to evaluation and inspection by the production certificate holder and the FAA since, in effect, such suppliers facilities constitute extension of the facilities of the holder of a production certificate. ***

(f)  An effective purchasing and receiving inspection system precludes release to production of nonconforming or unsafe articles procured from outside sources.  Such a system would ensure that:

1  Purchase orders provide specifications or other design data in the detail necessary to ensure procurement of the articles or services which meet the requirements of the approved type design.

2  All incoming articles conform to approved type design data prior to their acceptance and release to production. ***

4  Records are maintained of all inspections and tests performed by or for the holder of a production certificate in controlling the design configuration and conformity of all supplier furnished articles.

5 Inspection/Test records are utilized, as appropriate to document, as evidence of accomplishment, all required inspections, tests, rework, or rejections. ***

(9). Materials review.  A materials review system provides the means to:

(a)  Control the identification, rework, and use of nonconforming articles including the isolation and scrapping of unusable articles.

(b) ***The materials review system is a method acceptable to the administration for the approval of minor changes in type design in lieu of submitting to the Administrator any substantiating or descriptive data (Ref FAR 21.95) including manufacturing errors.****

**Defendants' Failure to Comply with Boeing's Advanced Quality System (AQS) D1-9000 Manual**

98.     The Boeing Advanced Quality System (AQS) D1-9000 manual (original and Revision A) provides requirements for D1-9000 quality assurance system approval and obligates Boeing and Ducommun, as a Boeing supplier, to fully and completely implement quality systems that are consistent with their D1-9000 level approval granted by and evaluated for compliance by Boeing Procurement Quality Assurance representatives.   Additionally, suppliers' contracts with Boeing call for D1-9000 compliance, and suppliers are required to implement D1-9000 compliant quality systems.   The Boeing AQS D1-9000 was approved, with signature, by Boeing Commercial Airplane Group President R.B. Woodward, Boeing Defense & Space Group President C.G. King, and The Boeing Company President and CEO P.M. Condit.   Boeing AQS D1-9000 incorporates ISO 9002 verbatim except for Boeing paragraph number references and provides for additional Boeing-specific requirements.   Defendant Boeing failed in the dispositioning of the subject nonconforming parts under its quality control/assurance policies, systems and procedures.   Despite Defendants' obligations to comply with the terms of the Boeing AQS D1-9000 manual, Defendants failed to fully and completely comply with, including, but not limited to, the following sections of Boeing AQS D1-9000 Revision A (see Complaint paragraphs herein at 2, 4, 20, 21, 23,

24, 25, 26, 27, 32, 35, 36, 38, 107, 110, 111, 115, 117, 119, 120, 121, 123, 125, 126, 131, 133, 134,

136, 137, 138, 139, 140, 142, 143, 144, 146, 147, 149, 152):

    a.  1.2  Quality System

        1.2.1 General

        The supplier shall establish, document and maintain a quality system as a means of ensuring that product conforms to specified requirements. The supplier shall prepare a quality manual covering the requirements of this International Standard. The quality manual shall include or make reference to the quality system procedures and outline the structure of the documentation used in the quality system.

    b.  1.9 Process Control

        The supplier shall identify and plan the production, installation and servicing processes which directly affect quality and shall ensure that these processes are carried out under controlled conditions. Controlled conditions shall include the following:

            a)    documented procedures defining the manner of production, installation and servicing, where the absence of such procedures could adversely affect quality;

                a.1) the preparation, maintenance and monitoring of manufacturing plans that contain clear, concise and complete instructions for work that affects product quality (other names for manufacturing plans include traveler, router, work order, process cards);

                a.2)    quality planning requirements, including references to applicable specifications and "interchangeable," "interchangeable/replaceable," and "replaceable" (I&R) provisions, on manufacturing plans;

                a.3)    a production planning system that includes tracking when a part is initially manufactured and that provides a schedule for the following: raw materials; tool design and fabrication; purchased or fabricated parts; and finishing, assembly, inspection and shipping operations;

            b)  use of suitable production, installation and servicing equipment, and a suitable working environment;

            c) compliance with reference standards/codes, quality plans and/or documented procedures;

> c.1)    compliance with all specified drawings, specifications and other requirements documents;
>
> d)   monitoring and control of suitable process parameters and product characteristics;
>
> e)  the approval of processes and equipment, as appropriate;
>
> f)  criteria for workmanship, which shall be stipulated in the clearest practical manner (e.g., written standards, representative samples or illustrations);
>
> g)  suitable maintenance of equipment to ensure continuing process capability;
>
> h)    accountability for all product and evidence that all manufacturing and inspection operations have been completed in sequence, as planned, or as otherwise documented and authorized.

Where the results of processes cannot be fully verified by subsequent inspection and testing of the product and where, for example, processing deficiencies may become apparent only after the product is in use, the processes shall be carried out by qualified operators and/or shall require continuous monitoring and control of process parameters to ensure that the specified requirements are met.

The requirements for any qualification of process operations, including associated equipment and personnel (see 1.18), shall be specified.

Note:  Such processes requiring pre-qualification of their process capability are frequently referred to as special processes.

Records shall be maintained for qualified processes, equipment and personnel, as appropriate (see 1.16).

c.  1.10  Inspection and Testing
1.10.1 General
The supplier shall establish and maintain documented procedures for inspection and testing activities in order to verify that the specified requirements for the product are met. The required inspection and testing, and the records to be established, shall be detailed in the quality plan or documented procedures.

d.  1.10.5  Inspection and Test Records
The supplier shall establish and maintain records which provide evidence that the product has been inspected and/or tested.  These records shall show clearly whether the product has passed or failed

the inspections and/or tests according to defined acceptance criteria. Where the product fails to pass any inspection and/or test, the procedures for control of nonconforming product shall apply (see 1.13).

Records shall identify the inspection authority responsible for the release of the product (see 1.16).

Test records shall show actual test results data when required by specification or Acceptance Test Plan.

e. 1.10.5.1 First Production Article
   Detailed data showing complete results of the inspection of the first production units manufactured shall be recorded and maintained (i.e., first article inspection).

f. 1.11.2 Control Procedure
   The supplier shall:
   a)  determine the measurements to be made and the accuracy required, and select the appropriate inspection, measuring and test equipment that is capable of the necessary accuracy and precision;
   b)  identify all inspection, measuring and test equipment that can affect product quality, and calibrate and adjust them at prescribed intervals, or prior to use, against certified equipment having a known valid relationship to internationally or nationally recognized standards. Where no such standards exist, the basis used for calibration shall be documented;
       b.1)   document a system for recall of measuring devices that require recertification;
   c)  define the process employed for the calibration of inspection, measuring and test equipment, including details of equipment type, unique identification, location, frequency of checks, check method, acceptance criteria and the action to be taken when results are unsatisfactory;
   d)  identify inspection, measuring and test equipment with a suitable indicator or approved identification record to show the calibration status;
   e)  maintain calibration records for inspection, measuring and test equipment (see 1.16);

f) assess and document the validity of previous inspection and test results when inspection, measuring or test equipment is found to be out of calibration;

f.1) recall product for re-inspection when the assessment in f) indicates that the result may be nonconforming product;

***

h) ensure that the handling, preservation and storage of inspection, measuring and test equipment is such that the accuracy and fitness for use are maintained;

i) safeguard inspection, measuring and test facilities, including both test hardware and test software, from adjustments which would invalidate the calibration setting;

j) ensure that subcontractors' inspection, measuring and test equipment conforms to the requirements of Section 1.11.

g. 1.13 Control of Nonconforming Product

1.13.1 General

The supplier shall establish and maintain documented procedures to ensure that product that does not conform to specified requirements is prevented from unintended use or installation. This control shall provide for identification, documentation, evaluation, segregation (when practical), disposition of nonconforming product, and for notification to the functions concerned.

Note 1: Parties requiring notification of nonconforming product may include internal organizations, customers, distributors and government agencies.

***

h. 1.17 Internal Quality Audits

1.17.1 Annual Audit

At least annually, the supplier shall conduct an internal audit to ensure compliance to their quality system and the requirements of D1-9000. This audit shall include examination of all quality operations and documentation, including procedures, inspections, training, process controls and certifications performed in each area. A flow down of the requirements from D1-9000 through the supplier's quality manual to the working-level procedures must be shown. Detailed internal audit check sheets must be developed for the working-level procedures that incorporate all the requirements of those procedures. Any deficiencies identified by the supplier must be documented and have a corrective action

plan developed. Corrective action plans must be disclosed at the request of the customer.

The audit personnel shall be impartial, but familiar with written procedures and standards applicable to the areas being audited. Also the auditors shall be trained in basic auditing techniques and concepts for conducting their internal audits.

Management with executive responsibility shall review the results of the internal audits.

i.  2.0  Introduction and General Requirements

2.0.3 Inspection Option—Statistical Process Control

When statistical process control is used as an option for in-process or final inspection, the following requirements shall be satisfied:

a)   Measurements are made by trained personnel (see Sections 1.18 and 2.0.6).

b)   The data consists of variable measurements taken at appropriate sampling frequencies (see D1-9000-1, AQS Tools, Section 1.12.2).

c)   Control charts are appropriate (see D1-9000-1, Section 1.12).

d)   After statistical process control has been established and capability has been calculated, the most recent point on the chart and the process capability ratio (Cpk) are used to determine appropriate actions.

j.  2.1  Determine Key Characteristics

2.1.4 Document Key Characteristics and Engineering Specifications on AQS Control Plan

[1]  The supplier shall prepare and maintain an AQS Control Plan, or equivalent, for all Boeing parts manufactured to the D1-9000 Section 2 AQS requirements. All parts, including first articles, required to be manufactured to the D1-9000 Section 2 AQS quality requirements shall be represented on an AQS Control Plan, or equivalent, with the Key Characteristic block completed prior to going into production. The information on this form, or equivalent documentation, is auditable and must be revised as necessary.

[2]   The engineering specifications (engineering requirements such as process parameters or dimensional specifications) and key characteristics identified by

1042711.1                                95

either Boeing or the supplier must be recorded on the AQS Control Plan, or equivalent, or the manufacturing plan.

k.  2.2  Provide Evidence of Variation
   2.2.1  Determine Process Steps Where Key Characteristics Are Measured
   ***
   Tooling and Measurements
   Tooling plays an integral role in accomplishing the variation reduction of key characteristics. Two aspects of tool design and manufacture should be considered.

   1) Tooling should be designed and built with the goal of minimizing variation at every stage of part manufacture. This involves minimizing variation within certain processes and reducing the amount of variation introduced by each tool. For example, there may be a need to:
   •  Reduce warping and twisting during process heating and cooling.
   •  Ensure repeatability of locating fixtures.
   •  Control flexure during loading, building, or moving of the part.

   2) It is important that tooling be designed and built to facilitate the collection of variables measurements for each key characteristic. Methods should be developed for indexing the part to the tool so that required key characteristic measurements can be obtained.

**Defendants' Failure to Conform with Industry Standards and Good Manufacturing Practices**

99.    Aerospace Standards "promotes the adoption of a process approach when developing, implementing and improving the effectiveness of a quality management system, to enhance customer satisfaction by meeting customer requirements."  (SAE AS9100 Revision B, Introduction).  Despite Defendants' obligations to conform to the Aerospace Standards and their representations of compliance, Defendants failed to fully and completely conform to, including, but not limited to, the following sections of AS9100 Revision B (see Complaint paragraphs herein

at 2, 4, 20, 21, 23, 24, 25, 26, 27, 32, 35, 36, 38, 108, 111, 112, 116, 118, 120, 121, 122, 124, 126, 127, 132, 134, 135, 137, 138, 139, 140, 141, 143, 144, 145, 147, 148, 151, 152):

a. 7.5.1.3  Control of Production Equipment, Tools and Numerical Control (NC) Machine Programs:    Production equipment, tools and programs shall be validated prior to use and maintained and inspected periodically according to documented procedures. Validation prior to production use shall include verification of the first article produced to the design data/specification.

Storage requirements, including periodic preservation/condition checks, shall be established for production equipment or tooling in storage.

b. 8.2.4.1  Inspection Documentation:  Measurement requirements for product or service acceptance shall be documented.   This documentation may be part of the production documentation, but shall include

a)  criteria for acceptance and/or rejection,
b)   where in the sequence measurement and testing operations are performed,
c)  a record of the measurement results, and
d)   type of measurement instruments required and any specific instructions associated with their use.

Test records shall show actual test results data when required by specification or acceptance test plan.

Where required to demonstrate product qualification the organization shall ensure that records provide evidence that the product meets the defined requirements.

c. 8.2.4.2  First Article Inspection:  The organization's system shall provide a process for the inspection, verification, and documentation of a representative item from the first production run of a new part, or following any subsequent change that invalidates the previous first article inspection result.

d. 8.3  Control of Nonconforming Product:
The organization shall ensure that product which does not conform to product requirements is identified and controlled to prevent its unintended use or delivery.  The controls and related responsibilities

and authorities for dealing with nonconforming product shall be defined in a documented procedure. ***

The organization's documented procedure shall define the responsibility for review and authority for the disposition of nonconforming product and the process for approving personnel making these decisions.

The organization shall deal with nonconforming product by one or more of the following ways:
   a) by taking action to eliminate the detected nonconformity;
   b) by authorizing its use, release or acceptance under concession by a relevant authority and, where applicable, by the customer;
   c) by taking action to preclude its original intended use or application.

The organization shall not use dispositions of use-as-is or repair, unless specifically authorized by the customer, if
   - the product is produced to customer design, or
   - the nonconformity results in a departure from the contract requirements.
   ***
Records of the nature of nonconformities and any subsequent actions taken, including concessions obtained, shall be maintained (see 4.2.4).

When nonconforming product is corrected it shall be subject to re-verification to demonstrate conformity to the requirements.

When nonconforming product is detected after delivery or use has started, the organization shall take action appropriate to the effects, or potential effects, of the nonconformity.

In addition to any contract or regulatory authority reporting requirements, the organization's system shall provide for timely reporting of delivered nonconforming product that may affect reliability or safety. Notification shall include a clear description of the nonconformity, which includes as necessary parts affected, customer and/or organization part numbers, quantity, and date(s) delivered.

100.    "The purpose of First Article Inspection [FAI] is to give objective evidence that all engineering, design and specification requirements are correctly understood, accounted for, verified, and recorded.  The purpose of this standard is to provide a consistent documentation requirement for aerospace components FAI."   (SAE AS9102 Revision A, Section 1.2).  Despite Defendants' obligations to conform to the Aerospace Standards and their representations of compliance, Defendants failed to fully and completely conform to, including, but not limited to, the following "Requirements" sections of AS9102 and AS9102 Revision A (see Complaint paragraphs herein at 2, 4, 5, 20, 21, 22, 23, 24, 25, 26, 27, 32, 35, 36, 37, 38, 112, 122, 124, 127, 132, 133, 134, 145):

    a.  5.1  Part Requirements:
        The Organization shall perform FAI on new Product representative of the First Production Run.

        NOTE:  For assemblies, the assembly level FAI shall be performed on those characteristics specified on the assembly drawing.

        NOTE:  The Organization shall not use prototype parts, or part manufactured using methods different from those intended for the normal production process, for the FAI.  The Standard may be used to verify conformance of a prototype part to the design requirements.

    b.  5.2  Evaluation Activities:
        The Organization should conduct the following activities in support of FAI.
            1.   Review documentation for the manufacturing process (e.g., routing sheets, manufacturing/quality plans, manufacturing work instructions, etc.) to make sure all operations are complete as planned.
            2.   Review referenced exhibits supporting the FAI (e.g., inspection data, test data, Acceptance Test Procedures, etc.) for completeness.
            3.   Review nonconformance documentation (if any), for completeness.
                NOTE:  International Aerospace Standard 9131 may be used as guidance.
            4.  Review material certifications for compliance, as applicable.

5.   Verify that approved Special Process sources are used (as applicable), and that the manufacturing planning/routing document calls out the correct specification.

6.   Verify that Key Characteristic requirements have been met, as applicable (see International Aerospace Standard 9103 for guidance).

7.   Verify part specific gages and/or tooling are qualified and traceable, as applicable.

8.   Verify that every design characteristic requirement is accounted for, uniquely identified and has inspection results traceable to each unique identifier.

c.   5.3  Partial or Re-accomplishment of First Article Inspection:
The FAI requirement, once invoked, shall continue to apply even after initial compliance.

The FAI requirements may be satisfied by a partial FAI that addresses differences between the current configuration and prior approved configurations.  When a partial FAI is performed, the Organization shall complete only the affected fields in the FAI forms.  FAI requirements may also be satisfied by previously approved FAI performed on identical characteristics of similar parts produced by identical means.  When FAI requirements (partial or complete) are satisfied in this manner, identify the approved configuration in the index of part numbers on Form 1.

The Organization shall perform a full FAI, or a partial FAI for affected characteristics, when any of the following events occurs:

1.   A change in the design affecting fit, form or function of the part.

2.   A change in manufacturing source(s), process(es), inspection method(s), location of manufacture, tooling or materials, that can potentially affect fit, form or function.

3.   A change in numerical control program or translation to another media that can potentially affect fit, form or function.

4.   A natural or man-made event, which may adversely affect the manufacturing process.

5.   A lapse in production for two years or as specified by the Customer.

d.   5.4  Nonconformance Handling:
The FAI is not complete until the Organization closes all non-conformances affecting the part and implements corrective actions.  The Organization shall re-do an FAI for those affected characteristics and shall record the results.

e.   5.5  Documentation:

5.5.1  Forms:  The Appendix of this Standard contains forms that comply with the documentation requirements of this Standard.  Each field in the forms is designated with a unique reference number.  Each field is also identified as:

- (R)     Required:  This is mandatory information.
- (CR)   Conditionally Required:  This field must be completed when applicable (i.e., when there exists a Customer requirement, then this field must be filled in).
- (O)     Optional:  This field is provided for convenience.

Forms contained in the Appendix should be used to document the results of the FAI.

NOTE:  The fields in the forms are color-coded for convenience.  Use of black-and-white forms is acceptable.

Forms other than those contained in the Appendix may be used, however they must contain all "Required" and "Conditionally Required" information and have the same field reference numbers.

All forms shall be completed either electronically or in permanent ink.

All forms shall be completed in English or in a language specified by the Customer.

NOTE:  Continuation sheets using the same form are acceptable or insert additional rows if completely electronically.

f.  5.5.2  Characteristic Accountability:  The Organization shall verify every Design Characteristic during FAI and record the results.   Every Design Characteristic shall have its own unique characteristic number.

NOTE:  Reference characteristics may be omitted from the FAI.

NOTE:  Use more than one line if needed for any characteristic.

NOTE:  Characteristics not measurable in the final product shall be verified during the manufacturing process (as long as they are not affected by subsequent operations) or by destructive means.  Characteristics verified at the detail level may be referenced in the assembly-level FAIR.

g.  5.5.3  Record of Results:  Results from inspection of design characteristics shall be expressed in quantitative terms (Variables Data) when a Design Characteristics is expressed by numerical limits.

The Organization shall record the results in the units specified on the drawing or specification, unless otherwise approved by the Customer.

Attribute Data (e.g., go/no-go) may be used if no inspection technique resulting in Variables Data is feasible. Attribute Data is permitted when the Design Characteristic does not specify numerical limits (e.g., break all sharp edges). It is also permitted where the qualified tooling is consistently used as a check feature and a go/no-go feature has been established for the specific characteristic.

h. 5.6 Control of Records:
   All FAI documentation required by this Standard shall be considered as a quality record and the Organization shall retain it according to Customer or regulatory requirements.

101. Despite Defendants' obligations to conform to the Aerospace Standards and their representations of compliance, Defendants failed to fully and completely conform to, including, but not limited to, the following sections of AS9100 (see Complaint paragraphs herein at 2, 4, 20, 21, 23, 24, 25, 26, 27, 32, 35, 36, 38, 108, 111, 112, 116, 118, 120, 121, 122, 124, 126, 127, 132, 134, 135, 137, 138, 139, 140, 141, 143, 144, 145, 147, 148, 151, 152):

a. 4.6.2 Evaluation of Subcontractors: The supplier shall:
   a. evaluate and select subcontractors on the basis of their ability to meet subcontract requirements including the quality system and any specific quality assurance requirements;
   ***
   d. ensure where required that both the supplier and all subcontractors use customer-approved special process sources;
   ***
   f. periodically review subcontractor performance. Records of these reviews shall be maintained and used as a basis for establishing the level of supplier controls to be implemented;
   g. maintain procedures that define the necessary actions to take when dealing with subcontractors which do not meet requirements.
   ****

b. 4.6.4 Verification of Purchased Product: The supplier shall implement procedures to verify purchased products. These may include:

- obtaining objective evidence of the quality of the product from subcontractors (e.g., accompanying documentation, certificate of conformity, test reports, statistical records, process control);
- inspection and audit at source;
- review of the required documentation;
- inspection of products at delivery;
- delegation of verification to the subcontractor, or subcontractor certification.

When delegation is used the supplier shall define the requirements for delegation and maintain a list of delegations.

c.  4.9  Process Control:

4.9.1  General:  The supplier shall identify and plan the production, installation and servicing processes which directly affect quality and shall ensure that these processes are carried out under controlled conditions.  Controlled conditions shall include the following:

a.  documented procedures defining the manner of production, installation and servicing, where the absence of such procedures could adversely affect quality;

b.  use of suitable production, installation and servicing equipment ***

c.  compliance with reference standards/codes, quality plans and/or documented procedures;

d.  monitoring and control of suitable process parameters and product characteristics; monitoring and control of key characteristics where required by purchase order/contract;

e.  the approval of processes and equipment, as appropriate;

f.  criteria for workmanship, which shall be stipulated in the clearest practical manner (e.g., written standards, representative samples or illustrations);

g.  suitable maintenance of equipment to ensure continuing process capability;

h.  accountability for all product during manufacture (e.g., parts quantities, split orders, nonconformities);

i.  evidence that all manufacturing and inspection operations have been completed as planned, or as otherwise documented and authorized;

j.  provision for the prevention, detection, and removal of foreign objects;

***

d.  4.10 Inspection and Testing:
4.10.1    General:    The supplier shall establish and maintain documented procedures for inspection and testing activities in order to verify that the specified requirements for the product are met. The required inspection and testing, and the records to be established, shall be detailed in the quality plan or documented procedures.

These procedures shall specify the resources and methods to be implemented, and methods of recording the results.

These procedures shall include:
- identification of authorized personnel;
- limits of authorization;
- training and qualification requirements.

Inspection documentation shall be maintained and controlled by the supplier.  This may be part of the manufacturing documentation, but shall include:
- criteria for acceptance and rejection;
- where in the sequence inspection and testing operations are performed;
- documents recording inspection results;
- identification of production inspection instruments;
- documents associated with specific inspection instruments enabling them to be designed, produced, validated, controlled, used and maintained.

When the supplier subcontracts inspection or test activities, the supplier shall control the subcontracted activity consistent with the requirements of section 4.6.

e.  4.10.2  Receiving Inspection and Testing:
4.10.2.1  The supplier shall ensure that incoming product is not used or processed (except in the circumstances described in 4.10.2.3) until it has been inspected or otherwise verified as conforming to specified requirements.   Verification of conformance to the specified requirements shall be in accordance with the quality plan and/or documented procedures.

f.  4.10.2.2  In determining the amount and nature of receiving inspection, consideration shall be given to the amount of control exercised at the subcontractor's premises and the recorded evidence of conformance provided.

g.  4.10.2.3  Where incoming product is released for urgent production purposes prior to verification, it shall be positively identified and recorded (see 4.16) in order to permit immediate recall and replacement in the event of nonconformity to specified requirements.

h.  4.10.2.4  When certification test reports are utilized to accept material, the supplier shall assure that data in said reports are acceptable per applicable specifications.  The supplier shall periodically validate test reports.

i.  4.10.3  In-Process Inspection and Testing:  The supplier shall:
a.  inspect and test the product as required by the quality plan and/or documented procedures;
b.  hold product until the required inspection and tests have been completed or necessary reports have been received and verified, except when product is released under positive-recall procedures (see 4.10.2.3).  Release under positive-recall procedures shall not preclude the activities outlined in 4.10.3a).

j.  4.10.4  Final Inspection and Testing:  The supplier shall carry out all final inspection and testing in accordance with the quality plan and/or documented procedures to complete the evidence of conformance of the finished product to the specified requirements.

The quality plan and/or documented procedures for final inspection and testing shall require that all specified inspection and tests, including those specified either on receipt of product or in-process, have been carried out and that the results meet specified requirements.

No product shall be dispatched until all the activities specified in the quality plan and/or documented procedures have been satisfactorily completed and the associated data and documentation are available and authorized.

k.  4.10.5  Inspection and Test Records:  The supplier shall establish and maintain records which provide evidence that the product has been inspected and/or tested.  These records shall show clearly whether the product has passed or failed the inspections and/or tests according to defined acceptance criteria.  Where the product fails to pass any inspection and/pr test, the procedures for control of nonconforming product shall apply (see 4.13).

Records shall identify the inspection authority responsible for the release of product (see 4.16).

Test records shall show actual test results data when required by specification or acceptance test plan.

Where required to demonstrate product qualification the supplier shall ensure that quality records provide evidence that the product meets the defined requirements.

l.  4.10.6  First Article Inspection:  The supplier's system shall provide a process, as appropriate, for the inspection, verification, and documentation of the first production article.

First Article Inspection documentation shall be retained (see 4.16) and shall include a list of the characteristics required by the design data and any required tolerances, the actual results, and when testing is required, the results of the tests.

The First Article Inspection shall be updated to include production process changes or configuration changes.

m.  4.11.2  Control Procedure:  The supplier shall:
a.    determine the measurements to be made and the accuracy required, and select the appropriate inspection, measuring and test equipment that is capable of the necessary accuracy and precision;
b.  identify all inspection, measuring and test equipment that can affect product quality, and calibrate and adjust them at prescribed intervals, or prior to use, against certified equipment having a known valid relationship to internationally or nationally recognized standards.  Where no such standards exist, the basis used for calibration shall be documented.

The supplier shall maintain a list of this equipment, including where appropriate, test devices and tools supplied by the customer;

c.  define the process employed for the calibration of inspection, measuring and test equipment, including details of equipment type, unique identification, location, frequency of checks, check method, acceptance criteria and the action to be taken when results are unsatisfactory;

d.  identify inspection, measuring and test equipment with a suitable indicator or approved identification record to show the calibration status;

e.  maintain calibration records for inspection, measuring and test equipment (see 4.16);

f.  assess and document the validity of previous inspection and test results when inspection or test equipment is found to be out of calibration.

When the assessment indicates that the product may be nonconforming, disposition the nonconformance;
***

h.  ensure that the handling, preservation and storage of inspection, measuring and test equipment is such that the accuracy and fitness for use are maintained;

i.  safeguard inspection, measuring and test facilities, including both test hardware and test software, from adjustments which would invalidate the calibration setting;

j.  define the method for recall of measuring devices that require calibration.

n.  4.12  Inspection and Test Status:
The inspection and test status of product shall be identified by suitable means, which indicate the conformance or nonconformance of product with regard to inspection and tests performed.

The identification of inspection and test status shall be maintained, as defined in the quality plan and/or documented procedures, throughout production, installation and servicing of the product to ensure that only product that has passed the required inspections and tests *** is dispatched, used or installed.

o.  4.12.1  Authorized Personnel:  Records shall identify personnel authorized to verify, certify and release products.

p. 4.13  Control of Nonconforming Product:

    4.13.1  General:  The supplier shall establish and maintain documented procedures to ensure that product that does not conform to specified requirements is prevented from unintended use or installation.

    This control shall provide for identification, documentation, evaluation, segregation (when practical), disposition of nonconforming product, and for notification to the functions concerned.

    The procedures established by the supplier shall also take into account process nonconformity that may result in product nonconformity.

    NOTE:  Parties requiring notification of nonconforming product may include subcontractors, internal organizations, customers, distributors and regulatory authorities.

    The term "nonconforming product" includes nonconforming product returned from a customer.

q. 4.13.2  Review and Disposition of Nonconforming Product:  The responsibility for review and authority for the disposition of nonconforming product shall be defined.

    Nonconforming product shall be reviewed in accordance with documented procedures.  It may be:
a.  reworked to meet the specified requirements;
b.  accepted with or without repair by concession;
c.  regarded for alternative applications, or
d.  rejected or scrapped.

    Where required by the contract, the proposed use or repair of product (see 4.13.2b) which does not conform to specified requirements shall be reported for concession to the customer or customer's representative.  The description of the nonconformity that has been accepted, and of repairs, shall be recorded to denote the actual condition (see 4.16).

    Repaired and/or reworked product shall be re-inspected in accordance with the quality plan and/or documented procedures.

The supplier's documented procedures shall define the process for approving personnel making material review decisions.

r.  4.13.2.4 Notification:  The supplier's system shall provide for timely reporting of nonconformities that may affect product already delivered including any continuing airworthiness actions. Notification shall include a clear description of the nonconformance, which includes as necessary parts affected, customer and/or supplier part numbers, quantity, and date(s) delivered.

s.  4.14.2 Corrective Action:  The procedures for corrective action shall include:

a.  the effective handling of customer complaints and reports of product nonconformities;

b.  investigation of the cause of nonconformities relating to product, process and quality system, and recording the results of the investigation (see 4.16);

c.  determination of the corrective action needed to eliminate the cause of nonconformities;

d.  application of controls to ensure that corrective action is taken and that it is effective;

e.  flow down of the corrective action requirement to a subcontractor, when it is determined that the subcontractor is responsible for the root cause;

f.  specific actions where timely and/or effective corrective actions are not achieved.

t.  4.16  Control of Quality Records:

The supplier shall establish and maintain documented procedures for identification, collection, indexing, access, filing, storage, maintenance and disposition of quality records.

Quality records shall be maintained to demonstrate conformance to specified requirements and the effective operation of the quality system.  Pertinent quality records from the subcontractor shall be an element of these data.

All quality records shall be legible and shall be stored and retained in such a way that they are readily retrievable in facilities that provide a suitable environment to prevent damage or deterioration and to prevent loss.  Retention times of quality records shall be established and recorded.  Where agreed contractually, quality

records shall be made available for evaluation by the customer or the customer's representative for an agreed period.

Records shall be available for review by regulatory authorities as required.

102.    Despite Defendants' obligations to conform to the Aerospace Standards and their representations of compliance, Defendants failed to fully and completely conform to, including, but not limited to, the following sections of AS9000 (see Complaint paragraphs herein at 2, 4, 20, 21, 23, 24, 25, 26, 27, 32, 35, 36, 38, 108, 111, 112, 116, 118, 120, 121, 122, 124, 126, 127, 132, 134, 134, 137, 138, 139, 140, 141, 143, 144, 145, 147, 148, 151, 152):

    a.  4.2  Quality System:
    4.2.1  General:  The supplier shall establish, document and maintain a quality system as a means of ensuring that product conforms to specified requirements.  The supplier shall prepare a quality manual covering the requirements of this document.  The quality manual shall include or make reference to the quality system procedures and outline the structure of the documentation used in the quality system.

    b.  4.9  Process Control:
    The supplier shall identify and plan the production, installation and servicing processes which directly affect quality and ensure that these processes are carried out under controlled conditions. Controlled conditions shall include the following:
        a.    documented procedures defining the manner of production, installation and servicing, where the absence of such procedures could adversely affect quality;
        b.  use of suitable production, installation and servicing equipment, and a suitable working environment;
        c.  compliance with reference standards/codes, quality plans and/or documented procedures;
        d.  monitoring and control of suitable process parameters and product characteristics;
            (1) monitoring and control of key characteristics when required by purchase order/contract;

e.  the approval of processes and equipment, as appropriate'

f.  criteria for workmanship, which shall be stipulated in the clearest practical manner (e.g., written standards, representative samples or illustrations);

g.  suitable maintenance of equipment to ensure continuing process capability;

h.  accountability for all product during manufacture (e.g., part quantities, split orders, nonconformities);

i.  evidence that all manufacturing and inspection operations have been completed as planned, or as otherwise documented and authorized;

j.  provisions for the prevention, detection, and removal of foreign objects.

Where the results of processes cannot be fully verified by subsequent inspection and testing of the product and where, for example, processing deficiencies may become apparent only after the product is in use, the processes shall be carried out by qualified operators and/or shall require continuous monitoring and control of process parameters to ensure that the specified requirements are met.

The requirements for any qualification of process operations, including associated equipment and personnel (see 4.18), shall be specified.
***
Records shall be maintained for qualified processes, equipment and personnel, as appropriate (see 4.16).

c.  4.10  Inspection and Testing:

4.10.1    General: The supplier shall establish and maintain documented procedures for inspection and testing activities in order to verify that the specified requirements for the product are met. The required inspection and testing, and the records to be established, shall be detailed in the quality plan or documented procedures.

d.  4.10.2  Receiving Inspection and Testing:

4.10.2.1 The supplier shall ensure that incoming product is not used or processed (except in the circumstances described in 4.10.2.3) until it has been inspected or otherwise verified as conforming to specified requirements.    Verification of conformance to the

specified requirements shall be in accordance with the quality plan and/or documented procedures.

e.  4.10.3  In-Process Inspection and Testing:  The supplier shall:
a.  inspect and test the product as required by the quality plan and/or documented procedures;
b.  hold product until the required inspection and tests have been completed or necessary reports have been received and verified, except when product is released under positive-recall procedures (see 4.10.2.3).  Release under positive-recall procedures shall not preclude the activities outlines in 4.10.3a) [*sic*].

f.  4.10.4  Final Inspection and Testing:  The supplier shall carry out all final inspection and testing in accordance with the quality plan and/or documented procedures to complete the evidence of conformance of the finished product to the specified requirements.

The quality plan and/or documented procedures for final inspection and testing shall require that all specified inspection and tests, including those specified either on receipt of product or in-process, have been carried out and that the results meet specified requirements.

No product shall be dispatched until all the activities specified in the quality plan and/or documented procedures have been satisfactorily completed and the associated data and documentation are available and authorized.

g.  4.10.5  Inspection and Test Records:  The supplier shall establish and maintain records which provide evidence that the product has been inspected and/or tested.  These records shall show clearly whether the product has passed or failed the inspections and/or tests according to defined acceptance criteria.  Where the product fails to pass any inspection and/or test, the procedures for control of nonconforming product shall apply (see 4.13).

Records shall identify the inspection authority responsible for the release of product (see 4.16).

h.  4.10.5.1  First Production Article:  The supplier's system shall provide a process, as appropriate, for the inspection, verification, and documentation of the first production article.

i.  4.11.2  Control Procedure:  The supplier shall:

a.    determine the measurements to be made and the accuracy required, and select the appropriate inspection, measuring and test equipment that is capable of the necessary accuracy and precision;

b.  identify all inspection, measuring and test equipment that can affect product quality, and calibrate and adjust them at prescribed intervals, or prior to use, against certified equipment having a known valid relationship to internationally or nationally recognized standards.  Where no such standards exist, the basis used for calibration shall be documented.

c.  define the process employed for the calibration of inspection, measuring and test equipment, including details of equipment type, unique identification, location, frequency of checks, check method, acceptance criteria and the action to be taken when results are unsatisfactory;

(1) the process shall consider the recall of inspection equipment, as appropriate.

d.  identify inspection, measuring and test equipment with a suitable indicator or approved identification record to show the calibration status;

e.  maintain calibration records for inspection, measuring and test equipment (see 4.16);

f.  assess and document the validity of previous inspection and test results when inspection or test equipment is found to be out of calibration.

***

h.  ensure that the handling, preservation and storage of inspection, measuring and test equipment is such that the accuracy and fitness for use are maintained;

i.  safeguard inspection, measuring and test facilities, including both test hardware and test software, from adjustments which would invalidate the calibration setting;

j.  4.12  Inspection and Test Status:

The inspection and test status of product shall be identified by suitable means, which indicate the conformance or nonconformance of product with regard to inspection and tests performed.  The identification of inspection and test status shall be maintained, as defined in the quality plan and/or documented procedures, throughout production, installation and servicing of the product to ensure that only product that has passed the required inspections and tests [or released under an authorized concession (see 4.13.2)] is dispatched, used or installed.

k.  4.13  Control of Nonconforming Product:

4.13.1    General:   The supplier shall establish and maintain documented procedures to **ensure that product that does not conform to specified requirements is prevented from unintended use or installation**.   This control shall provide for identification, documentation, evaluation, segregation (when practical), disposition of nonconforming product, and for notification to the functions concerned.

NOTES:

a.  Parties requiring notification of nonconforming product may include subcontractors, internal organizations, **customers**, **distributors and government agencies**.

b.    The term "nonconforming product" includes nonconforming product returned from a customer.

l.  4.13.2  Review and Disposition of Nonconforming Product: The responsibility for review and authority for the disposition of nonconforming product shall be defined.

Nonconforming product shall be reviewed in accordance with documented procedures.  It may be:

a.  reworked to meet the specified requirements;

b.  accepted with or without repair by concession;

c.  regarded for alternative applications, or

d.  rejected or scrapped.

Where required by the contract, the proposed use or repair of product (see 4.13.2b) which does not conform to specified requirements shall be reported for concession to the customer or customer's representative.  The description of the nonconformity that has been accepted, and of repairs, shall be recorded to denote the actual condition (see 4.16).

Repaired and/or reworked product shall be re-inspected in accordance  with the quality plan and/or documented procedures.

m.  4.13.2.4  Notification:  The supplier's system shall provide for timely reporting of nonconformities that may affect product already delivered.

n.  4.14.2 Corrective Action:  The procedures for corrective action shall

include:

a. the effective handling of customer complaints and reports of product nonconformities;

b. investigation of the cause of nonconformities relating to product, process and quality system, and recording the results of the investigation (see 4.16);

c. determination of the corrective action needed to eliminate the cause of nonconformities;

d. application of controls to ensure that corrective action is taken and that it is effective.

o. 4.16 **Control of Quality Records**:

The supplier shall establish and maintain documented procedures for identification, collection, indexing, access, filing, storage, maintenance and disposition of quality records.

Quality records shall be maintained to demonstrate conformance to specified requirements and the effective operation of the quality system. Pertinent quality records from the subcontractor shall be an element of these data.

All quality records shall be legible and shall be stored and retained in such a way that they are readily retrievable in facilities that provide a suitable environment to prevent damage or deterioration and to prevent loss. Retention times of quality records shall be established and recorded. Where agreed contractually, quality records shall be made available for evaluation by the customer or the customer's representative for an agreed period.

p. 4.17 Internal Quality Audits:

The supplier shall establish and maintain documented procedures for planning and implementing internal quality audits to verify whether quality activities and related results comply with planned arrangements and to determine the effectiveness of the quality system.

Internal quality audits shall be scheduled on the basis of the status and importance of the activity to be audited and shall be carried out by personnel independent of those having direct responsibility for the activity being audited. The results of the audits shall be recorded (see 4.16) and brought to the attention of the personnel having responsibility in the area audited. The management

personnel responsible for the area shall take timely corrective action on deficiencies found during the audit.

Follow-up audit activities shall verify and record the implementation and effectiveness of the corrective action taken (see 4.16)

**Defendants' Failure to Comply with Federal Regulations Requiring Implementation of Effective Quality Control Systems, Procedures, and Practices**

103.    Defendants were obligated under, among others, 49 U.S.C. § 1423(a)(2) and 14 C.F.R. § 21, to establish and maintain a quality control system to assure that each aircraft and their component parts will meet the design provisions of the type certificate issued by the FAA. Despite this obligation, Defendants failed to fully and completely maintain and adhere to its approved quality control systems.

**Seeking of Payment Based on False Claims**

104.    Defense Federal Acquisition Regulation (DFAR) Subpart 204.7108-204.7109 prescribe the requirement of including billing instructions in contracts issued by the U.S. Department of Defense. The associated clauses indicate how contractors should submit invoices for payment and what information must be included on the invoices to receive payment. DFAR Subpart 232.5 prescribes the allowance of progress payments (and the inclusion of associate clauses in contracts issued by the U.S. Department of Defense) to large business concern contractors at the rate of 80%. When a contractor has completed work or a portion of work required by contract, or when a progress payment is warranted by incurred costs, a contractor submits an invoice either in electronic format in accordance with DFAR Subpart 232.7003, in hard copy format in the form of DD Form 1149 (only as permitted under the terms of older contract awards), or on the contractor's own invoice form if it has been deemed acceptable by the

contracting activity, administering office (Defense Contract Management Agency "DCMA"), and/or the Defense Finance and Accounting Service (DFAS) (also only as permitted under the terms of older contract awards).  In accordance with DFAR Subpart 232.10, payment will be made to the contractor by the "contractor entitlement date, if any, specified in the contract, or 14 days after receipt by the designated billing office of a proper request for payment, whichever is later." If requests for payment are submitted by a contractor in electronic format, DFAR Subpart 232.70 requires that all "supporting documentation necessary for payment, such as receiving reports, contracts, contract modifications, and required certifications, also shall be processed in electronic form."  As of July 1, 2005 DFAS no longer accepts or pays paper invoices.  Relevant contract clauses are required to be included in the contracts issued by U.S. Department of Defense entities to prime contracts; thus, such payment terms and conditions were included in the prime contracts aforementioned in Paragraphs 43 through 88.   Boeing was required to submit invoices in accordance with the Federal Acquisition Regulation (FAR) and DFAR provisions in order to receive payment.   Upon information and belief, Boeing submitted invoices to the Defense Contract Management Agency (DCMA) (with copies being provided to the contracting authorities at the Department of the Navy and the Department of the Air Force), the invoices were reviewed along with supporting documentation required from Boeing, and then were forwarded to DFAS for payment to Boeing.  By submitting the invoices for payment, either progress or completion, when the subject aircraft contained unverified or nonconforming parts, Boeing submitted false claims to the U.S. government by failing to disclose material information about the nonconformities and deviations from contract specifications, which were essential elements to the U.S. government's decision to pay Boeing.  By submitting invoices for payment, either progress

or completion, when the subject aircraft contained unverified or nonconforming parts, Boeing further provided false implied certifications of compliance with applicable contract terms, specifications, statutes, rules and/or regulations as alleged herein

105.    The Material Inspection and Receiving Report (MIRR), Form DD 250, is an invoice-supporting document that the Department of Defense requires on contracts for supplies and services.    Defense Federal Acquisition Regulations (DFAR) Clause 252.246-7000 (as prescribed by DFAR Subpart 246.370) requires Department of Defense contractors to submit this form under contracts that have separate and distinct deliverables.    The DD 250 documents inspection and acceptance, receipt, and delivery/shipment dates.    Defendant Boeing was required to prepare and submit certifications of conformance with the contract terms, including but not limited to the DD 250 forms, for the delivery of each aircraft at issue and deliveries of spare parts to the payment office or other government personnel, whether submitted in hard-copy or by electronic means.    In accordance with the contract requirements and relevant DFAR regulations, upon information and belief, Defendant Boeing submitted DD 250's, as well as any other documentation regarding compliance or airworthiness for nonconforming Ducommun parts, to the U.S. government through submission to the Defense Contract Management Agency (DCMA) and/or the Department of Defense contracting activity personnel responsible for providing their acceptance that the deliveries of distinct deliverables, including the delivery of each aircraft and order for spare parts, "conform to contract, except as noted herein or on supporting documents." Upon information and belief, Defendants Boeing and Ducommun failed to fully and completely identify, warn, and disclose any nonconformities on the DD 250 forms or supporting and other disclosure documents and thereby knowingly made or used, or caused to be made or used, a false

record or statement that Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States for payment or approval of a false or fraudulent claim. Because of the allegations contained herein, all of these certifications of conformity were false. By submitting certifications of conformity along with requests for payment, either progress or completion, when the subject aircraft contained unverified or nonconforming parts, Boeing further provided false implied certifications of compliance with applicable contract terms, specifications, statutes, rules and/or regulations as alleged herein.

**E. Discovery of Nonconformances.**

106.    Throughout the period of manufacture of the Boeing 737-NG, beginning in or about 1994, Boeing procurement, manufacturing, and quality personnel became aware that Ducommun was delivering nonconforming parts, to include, without limitation, "bear straps," to Boeing--Wichita.

107.    The problem then perceived with the Ducommun bear straps concerned shy-edge margins. This defect in the parts resulted in the situations where Advanced Technical Assembly ("ATA") holes, which must be precisely located to within .030" (thirty-thousandths of an inch) of the required location, were instead located to .300" (three-hundred thousandths of an inch). As a consequence of this defect, Boeing assembly personnel were witnessed improperly redrilling the holes in the bear straps or forcing the parts into position for fastening to the airframe.

108.    Pursuant to the above observations, Boeing--Wichita production personnel initiated

an investigation of the Ducommun bear strap problem.   Boeing personnel involved in the first phase of the investigation, in 1998 and 1999, included Boeing employee Robert Hayes and Relator Jeannine Prewitt.    Prewitt confirmed that Ducommun had manufactured nonconforming and improperly manufactured bear straps, and reported her findings to Boeing Internal Audit personnel.

109.    In September 1999, a "Bear Strap Team" was created by Boeing.  It consisted of Relators Prewitt and Ailes, as well as Boeing employee Robert Hayes, who traveled to Ducommun's facility in California.   Over the course of that visit, the Bear Strap Team, documented  the  serious manufacturing problems described above.

110.    The team also found that Ducommun had **no** "SPC data" for any part it was manufacturing for Boeing (all divisions including Boeing--Wichita), as required by the FAA.  The required and missing SPC data would have shown if each of the parts made by Ducommun were within the permitted tolerances or not.  Parts manufactured without supporting SPC data cannot, pursuant to FAA regulations, be safely used in aircraft

111.    Based upon the findings of the Bear Strap Team, including, but not limited to the "lack of 100% inspection" (no SPC data)*, on September 29, 1999, Salvator Cerchio, Boeing's Quality Field Representative assigned to monitor Ducommun, entered a report in Boeing's computer system (Boeing SER No. 2833 19990929 193050P), which suspended Ducommun's ability to deliver its parts to Boeing--Wichita.

112.    Prewitt found that SER No. 2833 19990929 193050P,  as written on September 29, 1999 by Mr. Cerchio, had been deleted from the Boeing computer system by September 30, 1999. When confronted, Cerchio advised  Prewitt that he had been ordered by his supervisor, Rusty

Ulmer (Procurement Quality Manager), to delete the SER from the system to cover over the fact that he had suspended Ducommun's ability to deliver its parts to Boeing--Wichita.  As a result thereof, Ducommun continued to deliver bogus, defective and nonconforming parts to Boeing--Wichita.

113.    Based upon their investigation to date, in February 2000, Corporate Internal Audit tasked Ailes, Smith, and Prewitt to establish a "Tooling Audit Team" consisting of Boeing personnel with expertise in several related disciplines.  The Tooling Audit Team was formed in March 2000 under the auspices of Boeing--Wichita Supplier Management and Procurement ("SM&P"), and with the support of Boeing Internal Audit.  Other Boeing--Wichita departments represented on the Tooling Audit Team were Tooling, Manufacturing Research and Development ("MR&D"),  Procurement Quality Assurance ("PQA"), and Structural Bond ("SB").

114.    In addition to the Relators, the Tooling Audit Team was composed of Boeing employees Scott Sykes (SM&P), Dennis Miller (SM&P), Jim Wood (MR&D/SB), Robert Hayes (SB), Dennis Lebeda (MR&D/SM&P), Scott Ashby (Tooling), Chuck Fry (PQA), Lee Roy Cates (Tooling), Jim Gropper (PQA), and Salvator Cerchio (PQA Field Representative).

115.    The activities of the Tooling Audit Team were sufficiently sensitive that its members were instructed not to inform their direct supervisors of their activities; a highly unusual circumstance within the Boeing management structure.

116.    The Tooling Audit Team was assigned responsibility to perform a physical audit of tooling at Ducommun; assure compliance with Boeing's Tooling Documents; review planning and manufacturing compliance to D1-9000 (Boeing's Supplier Quality Control document) and Boeing

manufacturing specifications; analyze pricing and validity of tooling; and make recommendations regarding procurement and quality.

117.    The Tooling Audit Team spent several months doing research, before moving its investigation to Ducommun's facility in California.  The Team was at Ducommun from  May 8, 2000 until May 19, 2000.  The Tooling Audit Team, with Relator Smith appointed as its leader, returned to Ducommun in July 2000.

118.    As part of the audit of Ducommun, the Tooling Audit Team observed and documented how nonconforming parts from Ducommun were assembled by Boeing into aircraft at Boeing--Wichita.

119.    The Tooling Audit Team found that Ducommun "kept two sets of books."   The set of documents presented to the Tooling Audit Team by Ducommun were intended to mislead the Team to believe Ducommun used a specific manufacturing process in making parts for Boeing. These fake books were used to obtain the approval of Boeing for the Ducommun parts under FAA requirements.  The "real books" used by Ducommun fabrication personnel on the shop floor to actually make certain parts utilized an altogether different manufacturing process.

120.    The Tooling Audit Team found that the Ducommun parts were never properly inspected by Ducommun or Boeing before being incorporated into aircraft.

121.    The Tooling Audit Team found that Ducommun had not even performed a number of  First Article Inspections per FAA and Boeing requirements to ensure that manufacturing tools were properly configured for the production of conforming parts.

122.    In cases where First Article Inspections were actually conducted  by Ducommun,

the inspections were performed as though Ducommun were using production methods described in the fake books, when in fact Ducommun was using unapproved methods.  Thus, the First Article Inspection results on its chords, for instance, bore no relationship to the production ongoing at Ducommun, in clear violation of Boeing and FAA requirements.  This meant that the required inspections were meaningless.

123.    The Tooling Audit Team found that Ducommun did not collect or maintain any of the required SPC data on the parts it manufactured for Boeing.

124.    The Tooling Audit Team found that the tools Ducommun used in its so-called inspections  and other tools used for the acceptance of parts, were out of calibration, and could not be used to insure dimensional accuracy of the parts.

125.    The Tooling Audit Team on both visits to Ducommun witnessed and photographed Ducommun employees improperly forming Boeing parts by striking the parts with steel ball-peen hammers, thus compromising the structural integrity of the parts.

126.    The entire Tooling Audit Team was told by Mike Giles, a former Manager of Quality at Ducommun, that historically Ducommun had not inspected their parts as required and that Ducommun's tooling was not properly calibrated.

127.    On January 8, 2001, Relator Smith met with former Ducommun Quality Control Manager Tammy Pfrimmer.  Relator Smith was accompanied at this interview by Boeing employee Dennis Lebeda.  Pfrimmer advised Smith and Lebeda that Ducommun routinely omitted required inspections and that Ducommun did not have time to adhere to inspection requirements.

128.    During the audit, Dennis Miller, Team member, was advised by a California Boeing

Field Representative, John Bohon, that Ducommun falsified nondestructive test reports regarding the conductivity and hardness of parts Ducommun fabricated for Boeing.

129.    At  the end of their investigation at Ducommun's California facility, the Team met with Ducommun's President Bob Hansen for an exit meeting.  The exit meeting occurred on July 14, 2000, at which time Mr. Hansen defended Ducommun to the members of the Tooling Audit Team by saying: "AHF [Ducommun] violated all of our procedures, and Boeing violated all of its procedures, to get these parts in on time."

130.    From its investigation, the Boeing Tooling Audit Team determined that the "form, fit, and function" of the Ducommun parts was unknown, could not be determined from Ducommun production records, and could not be accepted as approved and safe.  It concluded that because the falsification of Ducommun process control documentation has been shown to be so widespread, none of the Ducommun parts should have been deemed "approved" parts.

**F.    Independent Substantiation of the Audit Team's Findings From Other Boeing Representatives and Records.**

131.    A multitude of Boeing documents, including SER's (Supplier Evaluation Reports) mirror the findings of the Tooling Audit Team.  As stated herein, SER's refer to Boeing's internal computer entries for reporting identified problems with Boeing suppliers.  They often required a response from the supplier.

132.    With regard to the Tooling Audit Team's findings that, in some cases, Ducommun had never performed crucial First Article Inspections, Boeing's records indicate exactly the same. A Boeing employee reported to Boeing in SER No. 2B65 20000711 154637P that Ducommun was "unable to provide objective evidence that a First Article Inspection Report [had] been created for

Boeing part number 143A1203-119 [the lower lobe frame doubler]."  Ducommun did not deny this finding, explaining Ducommun had "failed to complete and/or retain" a First Article Inspection report.

133.    At the same time as the audit, another Boeing employee found that Ducommun had routinely falsified the "shop travelers" for many of the parts it delivered to Boeing.  As part of the design process, Boeing engineers had created or approved "shop travelers," a process document which was designed to follow each part, and track the history of manufacture.  These "travelers" were intended to record the material, tools, and process involved in the manufacture of each part.

134.    It was discovered that Ducommun had changed its manufacturing process for many parts, and had not performed new "First Article Inspections" to validate these new processes. Boeing employees discovered Ducommun had falsified the "shop travelers" to make it appear Ducommun was using manufacturing processes which had been validated by First Article Inspections, but which were no longer in use.

135.    In SER No. 2B65 20000711 151638P, written on July 11, 2000, a Boeing quality assurance representative reported to Boeing  that the "travelers" for numerous parts had been falsified to conceal a change in the manufacturing process.  "Examples" of falsified documentation given in the report include fail-safe chords in the forward bulkhead, and in Section 43 of the aircraft at Stations 400, 460, and 520.  In other words, Ducommun had abandoned the approved manufacturing process and had adopted a new and unapproved process, and had concealed the change from Boeing.   Ducommun later admitted the truth of the SER findings in its response to Boeing.

136.    The new and unapproved process referenced above required the use of different

tools. It, therefore, became necessary for Ducommun to falsify travelers to reflect the use of tools which were not used, and to conceal the use of the tools that were actually used to make the parts.

137.    In SER No. 2B65 20000721 112151A, written on July 21, 2000, Boeing quality personnel reported to Boeing, "Per interviews with various [Ducommun] personnel many tools being used for manufacturing and/or inspection of Boeing product are not referenced on Ducommun's shop travelers." Again, Ducommun admitted to these findings to Boeing in its SER response, explaining, "No formal procedure for creating master planning existed detailing all requirements to be included in master planning document."

138.    With no controlled process in place to make these parts and with calibration of tools not maintained by Ducommun, the "form" and "fit" of the parts could not be ensured. As a result, parts were consistently delivered to Boeing with contour variations, shy-edge margins, and improperly placed "ATA" holes.

139.    In SER No. 2B33 19990908 160919P, written on September 8, 1999, a Boeing quality assurance representative reported to Boeing that Ducommun had not accomplished key design characteristics in manufacturing fail-safe chords used in Section 43 of the aircraft at Station 500, and that "The system has not produced a control chart/plan."

140.    In SER No. 2B33 19990929 193050P, written on September 29, 1999, a Boeing quality assurance representative, investigating "form" and "fit" discrepancies for AHF bear straps for the forward entry door (Part #141A3113-1), reported to Boeing, "This condition is due to the lack of 100% inspection of the characteristics with design requirements that are to be inspected on every part."

141.    In SER No. 2B33 19991001 142042P, written on October 1, 1999, a Boeing quality

assurance representative, again concerning the bear strap for the forward entry door (Part #141A3113-1), reported to Boeing, "It has been found that AHF Ducommun has not collect [sic] any key characteristic data on any bear strap that is produced by them. . . . .  At this time Boeing does not know if this supplier is in control of their process due to lack of SPC data that should show actual CP [control process] and CPK [process capability ratio] calculations. . . .  It has been determined that SPC [statistical process control] data has not been collected on any bear strap manufactured by AHF Ducommun."  Ducommun admitted the truth of these findings, explaining it had "overlooked" the "SPC requirements."

142.    On April 13, 2000, a Boeing investigation reported to Boeing  that fail-safe chords (Part #141A7415-6) which were used in the forward bulkhead section 41, had been under contour by 2 inches, and that ATA holes were out of location, and that "this condition is not new and has been causing I&R [Interchangeability and Replaceability] complications for a long time."

143.    In SER No. 2B65 20000518 132122P, written on May 18, 2000, a Boeing quality assurance representative reported to Boeing,  "AHF [Ducommun] was unable to provide objective evidence that . . . tools have been periodically checked for accuracy."

144.    In SER No. 2B65 20000831 091903A, written on  August 31, 2000, concerning fail-safe chords installed throughout the forward bulkhead, Boeing quality personnel reported to Boeing  as follows:  "AHF Ducommun was unable to provide objective evidence that control charts have been maintained and that process capability (Cpk) has been established for the 141A7415-Various series of part numbers.  Note:  This is a repetitive systematic finding."

145.    Boeing PQA Manager Chuck Fry, Boeing PQA Field Manager Sal Cerchio, and

Boeing PQA Field Rep Craig Deshler, wrote a Situation/Target/Proposal Options Report (STP) regarding additional quality findings on July 14, 2000.  The STP memorialized quality issues regarding no or incorrect First Article Inspections, inaccurate quality inspections of parts along with ATA holes, inaccurate planning, verification of dimensional "characteristics back to certified tools" [CMM], the need to conduct First Article Inspections on all parts not previously checked by CMM, the need to conduct receiving inspection audits, and to **"begin disengagement with AHF (get out)."**  The STP was delivered to quality and procurement management and seemingly disappeared.

146.    On August 31, 2000, PQA Manager Chuck Fry, Sal Cerchio and Craig Deshler went to Ducommun to continue quality auditing and reported to Boeing that Ducommun still did not have the required SPC data.

147.    The only conclusion to be drawn for these reports is that "unapproved" or "bogus" and/or nonconforming parts were manufactured by Ducommun from 1994 to 2004, delivered to Boeing, and used by Boeing in the assembly of each 737 "Next Generation," 747, 757, and 767 fuselages assembled at the Wichita plant.  These aircraft include over 45 which have been delivered to, and are in current use by, the United States military and foreign militaries.

148.    Due to the lack of trustworthy manufacturing process data, the "function" of the Ducommun parts cannot be determined in accordance with aeronautical engineering principles, and aircraft into which they have been incorporated are not "airworthy."

**G.    The Audit Team Reports to Boeing.**

149.    On August 24, 2000, the aforementioned Audit Report was provided to the following high ranking Boeing Executives:  Ron Brunton, Directory of Quality, Wichita; Vernell

Jackson, Director of Procurement,  Wichita; Dan Becker, Vice President and General Manager for Boeing's 747/767/777 Programs and the Everett site; Russ Bunio, Vice President/General Manager - Material Division at Boeing; Mike Cave, Vice President/General Manager of Airplane Programs for Boeing Commercial Airplanes; Jim Chilton, Program Manager for CAPPS (Checkout, Assembly and Payload Processing Services) at Boeing; Frederick Dodds, Wichita Boeing Counsel; Carolyn Harms, Director of Production, Wichita; Laurette Koellner, Vice President of Human Resource Corporate; Ricky Morriss, Director of Tooling, Wichita; Rick Swindler, Director of Finance, Wichita; Jeff Turner, Vice President/General Manager of the Wichita Division for Boeing Commercial.

150.    Relators were advised by Tammy Norman of Boeing internal audit that copies of their audit report including the audit's findings of serious quality deficiencies was given to Phil Condit, CEO, and other high ranking Boeing corporate executives in addition to those listed above. Relator Smith even emailed Mr. Condit in August 2003 to once again voice her concerns over the quality/ethics issues unearthed by the audit team.

151.    The Team made repeated presentations regarding their findings of fraud and misconduct on the part of Ducommun, beginning in September 1999 and continuing through early 2001. Such presentations were made to Boeing management, including, but not limited to, Vernell Jackson (Director of Procurement), Ron Brunton (Director of Quality), Diane Rogers (Ethics), Rick Dodds (Legal), Dan Marceau (Security Investigator), Gary Shaw (Director of Security Investigations), and Tammy Norman, Sonja Alseike and Mike Webdell (Corporate Internal Audit). The Team made substantive oral presentations regarding its findings of fraud and misconduct accompanied by extensive written data on several occasions, including, but not limited to,

September 1999 and October 1999; June 2, 2000; July 27, 2000; August 2, 2000; and November 28, 2000.

152.    Starting in May of 2000, and carrying on through the dates of their presentations, the Team advised Boeing executives, including, but not limited to those listed above, that parts procured from Ducommun by all other Boeing facilities and operating units are infected by the same severe quality system breakdown, procedural noncompliance, omission of inspections, tooling nonconformance, and product nonconformance as Team members found and documented with respect to Ducommun's performance related to Being--Wichita. The Audit Team recommended that Boeing management "[n]otify all Boeing Divisions of the audit findings in order to identify total impact to The Boeing Company."

153.    Relator Prewitt was recognized for outstanding performance by Boeing Vice President and Wichita General Manager Jeff Turner. Turner sent her a letter making a "Special Incentive Award of 40 shares of Boeing Company Stock" based on her "outstanding performance" as recognized by her "line management." The reason for the award was stated as follows:

> You are being recognized for your efforts in the recently completed tool audit at AHF-Ducommun Inc. Your knowledge and experience with material process allowed for the identification of over $5 million in inappropriate charges to Boeing Commercial Airplanes during the last three to four years.

154.    Three members of the Team were placed on a separate team charged with negotiating a "settlement" with Ducommun, though they were not given lead positions. Nevertheless, the negotiation team adopted the Team's findings en masse (including findings of gross quality control deficiencies) to negotiate a settlement from Ducommun.

**H.    Sweeping Ducommun Under the Rug.**

155.    As it became clear that Ducommun's quality problems were, in fact, Boeing's quality problems, Boeing senior management responded with a cover up, which began with uniform editorial "toning down" of the findings of the Team.  On August 20, 2000, the Audit Team's actual audit report was sent to Boeing's legal counsel, Frederick Dodd.  He and Boeing's Norman and Alseika sanitized from the report the extent of  Duccummon's quality control issues. Charges by the Team of supplier fraud were softened to read as "misrepresented processes" and all mention of FAA violations were stricken as well as not allowed to be made verbally during presentations within Boeing.  Upon information and belief, this process was part of Boeing's upper level management decision to keep from federal regulatory agencies and Boeing's own customers, including the United States Government, the fact that non-approved parts had been and continues to be assembled into  its aircraft including those at issue herein.

156.    At one point during the July 27, 2000 presentation by the Team to directors of Boeing, Carolyn Harms, (Director of Production) stated that in addition to taking steps to assure that safe parts were going to be supplied in the future by Ducommun, Boeing should also determine what action is required for aircraft already in service (in other words, issue an Airworthiness Directive).  Ron Brunton (Director of Quality) told Ms. Harms that her proposal was not going to happen.  Hence, Boeing's upper management executives including CEO, Phil Condit consciously decided to keep from federal regulatory agencies and Boeing's own customers including the United States Government the fact that non-approved parts had been and continued to be assembled into its aircraft including those at issue herein.

157.     To Relators' knowledge, Boeing has taken no steps to report the Team's findings to other operating units within Boeing, to include, without limitation, Military Aircraft or Space & Defense, even though Boeing Corporate Internal Audit and management advised the Team that it would take steps to do so.  Defendant Boeing has taken no significant steps to rectify the serious problems at Ducommun.  Rather, Boeing entered into sham negotiations with Ducommun, the result of which was a token payment by Ducommun to Boeing and no significant corrective action.

158.     Notwithstanding the initial reaction of Boeing to the Audit Report, when certain members of the Team went beyond the scope of their job responsibilities and pushed Boeing management for corrective actions concerning the uncovered quality control issues at Ducommun and Boeing, Relators and other Team members were subjected to pervasive and relentless retaliation.

159.     The Team members suffered threats, intimidation, harassment, defamation of character, professional discrediting, and demotion in retaliation for Team members', including the Relators', efforts to disclose and correct the fraudulent activity and safety violations.

160.     The situation deteriorated to the point that Relators were continually under attack by coworkers and management. They were disparaged and discredited by comments made by Boeing personnel to suppliers and others.

161.     On or about July 14, 2000, Ducommun President Bob Hansen told Boeing employee Nathan Adams to stay away from the Team because they would all be "shot." Adams and the Team understood this as a physical threat and immediately reported the incident to Internal Audit. It was also reported to Security Investigations, Procurement Management, and Ethics. Boeing took no action to ensure the security of Team members.

162.    On or about November 9, 2000, Relators Prewitt and Smith heard a conversation between Boeing procurement employee Terry Haas, who was tasked to negotiate the consequences of the audit findings with Ducommun management, and Ducommun Chief Financial Officer and General Counsel James Heiser.

163.    Haas stated that he knew that Ducommun had not followed required procedures and that Ducommun tooling was nonconforming to Boeing requirements. Haas told Heiser "you get in my pants and I'll get in your pants and we'll both be happy." Haas also stated to Heiser that in at least one case, Boeing had settled with a supplier because the supplier had information which would embarrass Boeing, and Boeing settled its claim to avoid publicity. Haas further stated that he had been told that the dispute between Boeing and Ducommun was "a very political situation."

164.    Portions of Haas's side of this conversation were overheard by other members of the Team as well as representatives of Boeing Corporate Internal Audit, to include Tammy Norman and Sonja Alseike. Relators took the initiative to act beyond their job responsibilities and reported this conversation to Dian Rogers of Boeing's Ethics Department, and Gary Shaw and Dan Marceau of Boeing's Security Investigations, but no actions were taken in response by Boeing management.

165.    In response to additional warnings of fraud and misconduct by Relator Smith, Boeing's Ducommun contracts manager John Musil advised Relator Smith that she should "drop this. We have settled and there is nothing you can do."

166.    In response to threats by Relators Prewitt and Smith that they were going to contact the Federal Aviation Administration regarding their findings of fraud, Boeing Manager of Security Investigations Gary Shaw ordered Relators Prewitt and Smith, in or about February 2001, that they were prohibited by Boeing from informing the Federal Aviation Administration of anything

regarding their findings at Ducommun, and that if they revealed any of that information to the FAA, Boeing could take legal action against them. Reporting directly to the FAA was outside the job responsibility scope of relators' Prewitt and Smith.

## I.    RETALIATION AGAINST RELATORS.

167.    As alleged herein, relators came to the conclusion from their audit work and related investigations that Ducommun and Boeing had perpetrated a fraud on the government.

168.    Furthermore, and as also alleged herein, Relators Smith and Prewitt were ordered and threatened not to discuss these matters with the FAA after Relators Smith and Prewitt asked to do so.  Reporting to the FAA was not within the scope of relators' job responsibilities.  Boeing's general counsel, Fredrick Dodds, on or about January 22, 2001, met with Relator Prewitt and other audit employees to address relators' vocalized concerns that Boeing management was not resolving the issue of the unauthorized parts being assembled on Boeing planes.  That meeting was held in response to the relators' insisting that Boeing Procurement Management had decided to portray the issue as one of contract and cost reductions rather than a safety concern/quality violation, and Mr. Dodds insisted that the relators could do nothing about it.  Relator Smith, along with employees Rob Hayes and Dennis Lebeda documented that, during negotiations, they were not allowed to present facts and data, including contractual issues and quality findings that Boeing Procurement Management did not address.  Relator Smith sent a copy to Internal Auditors Tammy Norman and Sonja Alseike; Security Investigations Gary Shaw and Dan Marceau; Ethics Dian Rogers; Procurement Director Vernell Jackson; and Legal Rick Dodds.

169.    In further response to relators' repeated vocalization of their concerns, on or about February 12, 2001, Boeing Manager Dave Wiseman and Internal Auditors Tammy Norman and Sonja Aleike met with the members of the Audit Team to inform them that the tasks assigned to the Audit Team had been completed and ordered the Audit Team members "to drop the matter" and not to continue discussing quality/safety issues associated with the unapproved Ducommun parts.  In response, Relator Prewitt, acting outside the scope of her job responsibilities, e-mailed Boeing Director Carolyn Harms, stating that, even though they had been ordered to drop the matter, many quality/safety concerns remained unresolved.

170.    On February 26, 2001, again acting outside the scope of their job responsibilities, relators and other members from the Boeing Audit Team met with Dian Rogers, Boeing's Ethics Manager, to discuss the findings of the ethics violations the auditors reported.  The auditors shared their concerns regarding why the quality/safety issues surrounding the unapproved Ducommun parts were not being addressed by Boeing management.  Ms. Rogers reiterated to them that business decisions had been made; that Boeing management did not want to know any more details; did not want to prove fraud, misrepresentation or abuse , but instead wanted the whole matter to go away.  Ms. Rogers went on to warn the relators (and other Boeing Audit Team members) that ethical or criminal charges could be filed against them for verbalizing the allegations, which, in essence, have been restated in this Complaint.

171.    In response thereto, when Relator Prewitt asked Gary Shaw if the team needed legal counsel, Shaw stated that the team could be sued by Boeing.  Relators then obtained counsel on February 2, 2001 and filed a *qui tam* action against the defendants on March 8, 2002.  Filing such a suit was not within the scope of relators' job responsibilities.  And even though the 2002 *qui*

*tam* was under seal pursuant to statute, relators learned, in the course of the United States government's investigation of the same, that defendant Boeing became aware of the lawsuit's existence and the identity of, at least, Relators Smith and Prewitt.

172.    Relator Smith was hired into a Boeing position which was advertised as a promotion. She was not given the grade raise associated with the position. She was required to work amongst and for the procurement personnel and management whose misconduct she had provided damaging information about in the audit. Boeing dropped her retention rating from "R1" to "R2." In other words, Boeing made Relator Smith more likely to be laid off in a reduction in workforce situation without justification. Smith was laid off from Boeing in September 2003, after she understood that she had reached an agreement with Boeing that provided for her continued employment. Smith was the only procurement agent laid off in the Wichita Division during this time period.

173.    After the Ducommun episode, Relator Ailes was taken off the Tooling Audit Team. He was told by his second-line manager Mike Crawford that he and the Team needed "parental guidance," and he was no longer allowed to work with the other Team members. Relator Ailes's retention rating was also dropped without explanation.

174.    Despite Relator Prewitt's outstanding performance regarding the Ducommun audit, when a subsequent permanent "tooling team" was created, Ms. Prewitt was not allowed to interview for placement due to her purported lack of qualification in the eyes of Boeing Procurement Management, but was required to participate in the training of the new tool team along with Rob Hayes. Prewitt was advised by her supervisor to apply for other jobs at Boeing since Boeing was not going to allow her to work in the procurement division any longer.

Moreover, Ms. Prewitt's supervisors at Boeing refused to provide her with performance evaluations, resulting in lowered retention rating from "R2" to "R3." This reduction culminated in Ms. Prewitt's job termination in November 2003.

175.    Since retaliation against her and the other members of the Team started, Relator Prewitt was diagnosed with fibromyalgia, an extremely painful joint-pain syndrome. Stress is well-recognized as a cause of fibromyalgia. Boeing denied Relator Prewitt's applications for disability compensation, disputing that her illness was induced by job stress.

176.    Relator Smith has also been diagnosed with severe stress-related physical disabilities, to include, without limitation, fibromyalgia.

177.    In the case of both Relators Smith and Prewitt, these conditions are related directly to the severe retaliatory actions taken by Boeing personnel as a result of the Team's persistence in reporting fraud, abuse, and misconduct on the part of Ducommun and Boeing.

178.    The conduct of Boeing personnel is well-described in a letter sent by Boeing Employee Assistance Counselor Martha Webb, who interviewed the Team, to a psychologist in connection with his treatment of Relator Smith:

> Throughout the course of the audit, the team discovered problems and discrepancies, which they dutifully prepared to report. Even at this point, they continued to believe that the information would be beneficial, and therefore welcomed by those to whom they would report. According to every member of the team, the reaction they received was the opposite.

> While I cannot list every incident that was reported during my meeting with the audit group, the overall picture that emerges is one of "shooting the messenger." They have been subjected to incidents of verbal abuse, calling into question their own professionalism, ethics, and abilities.

179.    Relator Prewitt went on a medical leave of absence from spring 2001 to spring 2003.  Upon her return from medical leave, she was not placed in Procurement.  Nor was she placed in a position that utilized her skills.  Instead, she was given no work to perform and was told that Boeing wanted her gone.

180.    Upon her return to work from medical leave, Relator Prewitt was subjected to the supervision of individuals who were earlier criticized for their roles and decisions made in regard to subcontract work with Ducommun.

181.    In the fall of 2003, Relator Prewitt's retention rating was reduced from "R2" to "R3," despite the fact that she had not been allowed to perform work for which she was trained, and despite the fact that she had not received a performance evaluation since 1999.

182.    Relator Prewitt's reduced retention rating subjected her to layoff, and in August 2003, she was notified of her impending layoff scheduled for November 2003.  Prewitt was the only materials management analyst/buyer laid off in the Wichita Division during this time period.

183.    Despite having recall rights, and despite numerous job openings during the intervening period between her layoff and the present, Relator Prewitt has not been recalled to any position with defendant.  She was overlooked regarding a buyer position involving her skill code and skill level.

### V.  COUNT I -- BOEING VIOLATIONS OF 31 U.S.C. § 3729(a)(1) AND (2)

184.    The allegations of the preceding paragraphs 1 through 183 are incorporated by reference and realleged as though fully set forth herein.

185.    All aircraft and spare parts delivered by Boeing to the United States government containing parts manufactured by Ducommun in or after 1994 are unapproved and unsafe.

186.    Boeing submitted false claims and/or false documents to the United States government in connection with each of the aircraft and spare parts described in the preceding paragraph.

187.    Boeing knew or was recklessly indifferent to the facts of such nonconformance at or before the time it submitted the false claims.

188.    Boeing violated the False Claims Act, 31 U.S.C. § 3729(a), with respect to each such aircraft and each such document.

189.    The United States government was damaged as a result, as further alleged herein.

## VI.  COUNT II – FALSE CLAIMS ACT AGAINST DEFENDANT DUCOMMUN

190.    The allegations of the preceding paragraphs 1 through 189 are incorporated by reference and realleged as though fully set forth herein.

191.    Defendant Ducommun knowingly submitted false claims to Boeing when it sold Boeing parts for aircraft destined for federal service which it knew were manufactured as described herein.

192.    Defendant Ducommun knowingly caused to be submitted through defendant Boeing false or fraudulent claims for payment or approval to officers, employees, or agents of the United States government.  Defendant Ducommun knowingly made, used, or caused to be made or used, false records or statements to obtain government payment through defendant Boeing, for false or fraudulent claims, or to avoid obligations to the United States government.  Defendant Boeing, by and through its officers, agents and employees, knowingly made, used, or caused to be made or used, false records, statements or certifications to obtain payment on false or fraudulent claims submitted to the U.S. government.

193.    Defendant Boeing, by and through its officers, agents and employees, knowingly presented, or caused to be presented, to an officer or employee of the U.S. government or a member of the Armed Forces of the United States, false or fraudulent claims for payment or approval.

194.    The United States government has been damaged, as further alleged herein, as a result of Ducommun's violations of the False Claims Act.

## VII.  COUNT III -- VIOLATIONS OF 31 U.S.C. § 3730(h)

195.    The allegations of the preceding paragraphs 1 through 194 are incorporated by reference and realleged as though fully set forth herein.

196.    Defendant Boeing, motivated by the lawful acts described above taken by Relators in furtherance of this action, discriminated against Relators regarding the terms and conditions of their employment.

197.    Boeing knew that Relators were investigating allegations of a sort which are routinely advanced in *qui tam* actions under the False Claims Act, and which could reasonably be expected, if left unresolved, to lead to such an action.

198.    Defendant Boeing's retaliatory employment actions have directly caused monetary damages and injuries to each Relator, as well as serious physical and emotional injuries.

199.    Defendant Boeing's actions constitute violations of the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h).

## VIII.  COUNT IV -- VIOLATION OF THE PUBLIC POLICY OF KANSAS

200.    The allegations of the preceding paragraphs 1 through 199 are incorporated by reference and realleged as though fully set forth herein.

201.    Boeing's actions in violating its contracts with the United States government and delivering nonconforming aircraft to the United States government violates the public policy of the State of Kansas and the public policy of the United States, as exemplified by properly promulgated regulations of the Federal Aviation Administration, pose a hazard to the public health and safety, including the health and safety of American military personnel and the flying public. Relators engaged in protected activity by complaining to Boeing about the actions taken by Boeing and Ducommun as fully set forth herein.

202.    Boeing's gross misconduct toward Relators, manifested by its requiring them to work in an atmosphere pervaded by fraud and misconduct, was characterized by a spirit of ill will, hatred, or malice. Boeing's actions were motivated, in whole or part, by Relators' exercising their rights and complaining about the actions taken by Boeing and Ducommun as fully set forth herein.

203.    Boeing's retaliatory actions against Relators violates the public policy of Kansas and caused them serious harm, including, but not limited to, lost wages, benefits, and emotional pain and suffering.

## IX.  PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of the United States and on their own behalf, demand judgment against defendant as follows:

A.    That the Court enter judgment against the defendant in an amount equal to three times the amount of damages the United States government sustained because of their actions, plus a civil penalty of $10,000.00 for each false claim made on or before September 28, 1999, and $11,000.00 for each false claim made on or after September 28, 1999, together with the costs of

this action, including the cost to the United States government for its expenses related to this action.

B.     That Relators be paid their attorney fees and costs.

C.     That in the event that the United States intervenes in this action, Relators be awarded an amount for bringing this action of twenty-five percent (25%) of the proceeds of the action or settlement of the claims.

D.     That in the event the United States does not intervene, Relators be awarded thirty percent (30%) of the proceeds.

E.     For each Relator on her or his claim of retaliation in violation of 31 U.S.C. § 3730(h), reinstatement of her or his original retention rating, back pay with interest, compensatory and special damages, litigation costs, and attorney fees.

F.     That in connection with their claims that Boeing violated public policy, Relators be awarded compensatory and punitive damages.

G.     That the United States and Relators receive all relief both at law and in equity to which they may reasonably appear entitled.

Respectfully submitted,

s/     Corlin J. Pratt
Corlin J. Pratt
Bar No. 12213
UNRUH & PRATT
100 North Broadway, Suite 510
Wichita, KS 67202-2205
Telephone:  316-269-2006
Fax:  316-269-0437
E-mail:  cjpratt@guplaw.com

1042711.1                                     142

William J. Skepnek
Bar No. 10149
SKEPNEK LAW FIRM, P.A.
900 Massachusetts, Suite 601
Lawrence, KS 66044
Telephone: 785-331-0300
Fax: 785-331-0303
E-Mail:  bskepnek@sunflower.com

Michael R. Grimm, Illinois Bar No. 01062220
Dean S. Rauchwerger, Illinois Bar No. 618973
James F. Smith, Illinois Bar No. 6202259
CLAUSEN MILLER PC
10 South LaSalle Street
Chicago, Illinois 60603-1098
Telephone: 312-855-1010
Fax:  312-606-7777
E-Mail:  mgrimm@clausen.com
E-Mail:  drauchwerger@clausen.com
E-Mail:  jsmith@clausen.com

***Attorneys for Plaintiffs and Relators***

143

1042711.1

## DEMAND FOR JURY TRIAL

COME NOW Plaintiffs-Relators Taylor Smith, Jeannine Prewitt, and James Ailes, by and through counsel, and acting on behalf of the United States of America and on their own behalf, and hereby request a trial by jury on all issues of fact herein.

Respectfully submitted,

s/     Corlin J. Pratt
Corlin J. Pratt, Bar No. 12213
Terry L. Unruh, Bar No. 10084
UNRUH & PRATT
100 North Broadway, Suite 510
Wichita, KS 67202-2205
Telephone:  316-269-2006
Fax:  316-269-0437
E-Mail:  cjpratt@guplaw.com
E-Mail:  tlunruh@guplaw.com

William J. Skepnek, Bar No. 10149
SKEPNEK LAW FIRM, P.A.
900 Massachusetts, Suite 601
Lawrence, KS 66044
Telephone: 785-331-0300
Fax: 785-331-0303
E-Mail:  bskepnek@sunflower.com

Michael R. Grimm, Illinois Bar No. 01062220
Dean S. Rauchwerger, Illinois Bar No. 618973
James F. Smith, Illinois Bar No. 6202259
CLAUSEN MILLER PC
10 South LaSalle Street
Chicago, Illinois 60603-1098
Telephone: 312-855-1010
Fax:  312-606-7777
E-Mail:  mgrimm@clausen.com
E-Mail:  drauchwerger@clausen.com
E-Mail:  jsmith@clausen.com

*Attorneys for Plaintiffs and Relators*

1042711.1