IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA, *ex rel.* )
TAYLOR SMITH, JEANNINE PREWITT, )
and JAMES AILES, )
)
      Plaintiffs/Relators, )
)
v. )  Civ. Action No. 05-1073-WEB
)
THE BOEING COMPANY )
and DUCOMMUN, INC., )
f/k/a AHF-Ducommun, )
)
      Defendants. )
_____)

## Memorandum and Order

  The above-named Relators filed this *qui tam* action on behalf of the United States.  *See* 31

U.S.C. § 3730(b).  The United States has elected not to intervene in the action.  Doc. 4.  The matter

is before the court on the defendants' Motions to Dismiss all or part of the Second Amended

Complaint.  Like the prior complaint, the Second Amended Complaint (hereinafter the "SAC")

alleges that Boeing and one of its subcontractors, Ducommun, Inc., violated the False Claims Act

by submitting or causing the submission of false claims for payment to the U.S. Government.  The

Relators claim that shortcomings at Ducommun resulted in delivery of "bogus,"  "unapproved,"or

"nonconforming"aircraft parts to Boeing, and that after the Relators and others brought these facts

to Boeing's attention, Boeing concealed the information and submitted false claims for payment

relating to aircraft and aircraft parts delivered to the U.S. Government.  The Relators further claim

that Boeing retaliated against them after they reported the information to Boeing management.  The

defendants deny the allegations.

  The court previously found the first Amended Complaint deficient in part because it relied

on vague allegations that aircraft containing Ducommun parts were sold by Boeing "during the relevant time period," and the parts did not conform to "contract requirements," "U.S. Military specifications, where applicable," and "Federal Aviation Administration (FAA) requirements." Moreover, with regard to the submission of false claims for payment, the first Amended Complaint alleged in the broadest possible terms that "Boeing submitted false claims and/or false documents to the United States government in connection with each of the aircraft and spare parts described...." The court found that Rule 9(b) required greater specificity concerning the circumstances of the alleged fraud.

The SAC now contains over 100 *additional* pages relating to Relators' FCA claims. It spans some 144 pages in total. Although the SAC has in fact addressed the shortcomings referred to above, it has attained its immense length in part through needless repetition of identical paragraphs and wholesale reiteration of regulatory passages and administrative rules. Needless to say, that is not what the court had in mind when it concluded the Relators should state the alleged fraud with greater particularity.

I. *Boeing's Motion to Dismiss Count 1*.

Boeing argues that although the Relators have expounded on the legal requirements that prohibited Boeing from delivering defective aircraft, "still missing ... is the actual fraudulent scheme – the process by which supposedly defective Ducommun parts were knowingly installed by Boeing onto the government's aircraft and yet certified as conforming in support of Boeing's claims for payment." Doc. 74 at 3. Boeing contends the SAC does not allege "what Boeing's quality control system determined ... about the suitability of the parts," and that "if Boeing engineers and quality assurance personnel either caught a nonconforming part prior to installation on an aircraft or

2

subsequently determined that a part was suitable for use notwithstanding errors by Ducommun, there could be no fraud on the government." *Id*. Boeing states that it was required to use a Material Review Board to determine whether nonconforming parts should be used, reworked, or scrapped, and it contends the Relators have failed to allege that the Review Board found the parts to be unsuitable for use. *Id*. at 9. Furthermore, Boeing asserts that none of the Supplier Evaluation Reports ("SER's") cited by Relators stated that the parts produced by Ducommun were unsuitable for use on aircraft. Nor does the SAC explain, according to Boeing, "how supposedly defective parts came to be approved for use by Boeing's quality control system and certified as nondefective in support of claims for payment." *Id*. at 10. Additionally, Boeing claims the Relators still fail "to identify even one example of a false claim submitted by Boeing." *Id*. at 4.

Boeing concedes the SAC now includes allegations of particular contract specifications for the aircraft at issue, but insists that it still fails to indicate "why Boeing is believed to have fraudulently certified compliance with any of them." *See id*. at 18-19. Boeing also objects that the SAC fails to explain the basis for Relators' allegations that various rules and regulations – including numerous CFR's, FAA regulations, DOD airworthiness criteria, and Boeing internal quality control standards – were incorporated into or applied to the contracts for these aircraft. *Id*. at 19. Moreover, it complains that the SAC quotes numerous regulatory provisions without alleging that Boeing violated these provisions, thereby obscuring rather than illuminating the basis of Relators' claims. *See id*. at 20-22.

Boeing contends the SAC still "does not disclose the contents or substance of any false representation or certification made by defendants in connection with any claims for payment." *Id*. at 23 (quoting court's prior order). It maintains that "none of the 111 pages added to the Amended

3

Complaint supplies the missing information on *what* claims for payment Boeing submitted, *how* and *why* the claims were fraudulent, *when* and *where* any claims were submitted, or *who* was involved in their submission to the government." *Id*. at 24.   In sum, Boeing argues Count 1 of the SAC should be dismissed, and that in light of the history of the case the dismissal should be with prejudice.

### A. Summary of Allegations in SAC.

Relators claim that serious defects in the manufacturing and quality control functions at Ducommun resulted in delivery of "unapproved or bogus and/or nonconforming parts by Ducommun to Boeing," which were installed by Boeing in aircraft sold to the United States.  SAC ¶ 1.  The SAC alleges that such parts "are not airworthy from a safety engineering standpoint and cannot be used in airplanes." *Id*.  Relators claim that when they brought this information to Boeing's attention, Boeing chose to conceal it rather than disclose it to the Federal Aviation Administration (FAA).  *Id*. ¶ 2.  Relators claim these defects pose hazards to passengers and crews on aircraft containing Ducommun parts. ¶ 3.  Relators claim the Boeing aircraft at issue are defective because they have been assembled with flight-critical parts or "primary structural elements" manufactured in violation of contract specifications or not verified through a proper quality assurance process, all of which the defendants have fraudulently concealed from the U.S. Government.  ¶ 4.

The SAC alleges that Boeing's quality assurance system "failed to legitimately determine that the nonconforming parts were acceptable and suitable for use on the subject aircraft."  ¶ 26.  It alleges that once defective and nonconforming parts were identified by Boeing, it failed to require corrective action "and in some cases falsified records to allow these parts to be assembled into its aircraft."  Boeing allegedly "failed to disclose, notify and warn the United States" that the aircraft "were manufactured in violation of aircraft contract requirements, design specifications, type-design,

and/or contain unverified parts." ¶ 27.

Relators have identified approximately 20 different types of "flight safety critical parts" manufactured by Ducommun that were assembled by Boeing into its aircraft.  The aircraft include those identified in ¶ 30, which were sold or leased to the U.S. Government, and those in ¶ 31, which were sold or leased to foreign governments pursuant to the "Foreign Military Sales program of the United States."  These two paragraphs identify the recipient of each aircraft, the model and serial numbers, the delivery date, the federal contract number, and the "suspected quantity of unapproved parts" in each aircraft.

Relators allege that as a result of these quality assurance deficiencies, the identified aircraft (together with all other aircraft sold by Boeing which incorporated Ducommun parts during the period 1994-2004) did not conform to: "(1)contract requirements, including mandatory drawings from which deviation is not permitted; (2) U.S. Military Specifications, where applicable; and (3) Federal Aviation Administration (FAA) requirements."  ¶ 32.  Because of these violations and nonconformities, "the parts identified in the charts at Paragraphs 30 and 31 are unairworthy and did not comply with all requirements of Boeing's aircraft contracts with the U.S. government," and "[a]ll claims for payment submitted by Boeing to the U.S. government for these aircraft were false claims for payment."  *Id.*  According to the SAC, all of Boeing's claims for payment to the U.S. government for these aircraft "were knowingly false because Boeing actually knew, recklessly disregarded or deliberately ignored the fact that the flight-critical subject parts were made in violation of contract terms, design specifications, type-design, and other such requirements."  ¶ 33.

Relators specifically identify a number of Ducommun parts that were allegedly "nonconforming."  *See* SAC ¶¶ 24-41.  They allege that failure of any of these components would

compromise the structural integrity of the aircraft.

The SAC alleges that the defendants provided the subject aircraft to the U.S. Government "pursuant to contractual agreements that required full and complete compliance with, among others: Defendants' internal commercial policies, procedures, standards, and disciplines for quality, management, documentation, and verification; Federal Aviation Regulations (FAR); Industry Aerospace Standards (AS); the Code of Federal Regulations (CFR); the International Organization for Standardization (ISO); Department of Defense Handbook on Airworthiness Certification Criteria (MIL-HDBK-516A); the Joint Service Specification Guide (JSSG 2006); the Federal Aviation Administration Advisory Circular AC-21-1B (Circular); and good manufacturing processes." ¶ 42.

In ¶¶ 43-88, the SAC identifies particular contracts entered into by Boeing with the U.S. Government. Paragraph 43, for example, provides specifics regarding a contract to deliver a particular Boeing 737 aircraft to the U.S. Navy. It alleges that Boeing's Contract Manager signed this agreement on "Standard Form 1449 as prescribed by FAR 53.212." It alleges that specific contractual provisions were attached to the form and became part of the contract. After entering the contract, Boeing allegedly revised its Type Data Certificate so as to allow the company to manufacture this particular aircraft. Relators appear to allege that this certificate is required by the contract to serve as evidence that the aircraft meets FAA airworthiness requirements,[1] and that when Boeing delivered the aircraft to the U.S. Government with the certificate, "the Boeing Company falsely represented compliance with the specific FAA regulations as set forth herein in Paragraph

---

[1] The SAC alleges in rather confusing fashion that the certificate is "required by the contract to serve as evidence of completion for verification of the specifications that this specific serial-numbered aircraft met certain airworthiness requirements of the FAA as referenced below and herein." ¶ 43.

97." ¶ 43a.  They allege that along with the delivered aircraft, Boeing also provided a Certificate of Airworthiness (FAA Form 8130-6), portions of which were materially false because Boeing fraudulently certified that it had complied with contract specifications and falsely implied that Boeing and its subcontractors had manufactured the component parts in accordance with type design.  ¶ 43b.  Relators  allege that Boeing also provided a Statement of Conformity to the U.S. Government (FAA Forms 8130-2 and 8130-9), which fraudulently omitted from its disclosures that the Ducommun parts Boeing assembled into the aircraft deviated from type design.  ¶ 43c. According to the SAC, "these false statements and claims for payment by The Boeing Company to the U.S. government had the effect of concealing the fact that the aircraft were nonairworthy and potentially dangerous."  As a result, Relators contend, the aircraft requires additional and more frequent inspections and repairs and has a lessened market value.  ¶ 43d.  Paragraphs 44-88 of the SAC contain essentially identical allegations pertaining to other contracts for aircraft manufactured for the U.S. Government.

Paragraph 89 of the SAC identifies various specific contract provisions as to which Boeing allegedly made false representations of compliance, including provisions relating to Boeing's responsibility to provide complete air vehicles as defined by the contract (including FAA certification); its duty to conduct an FAA certification program on the first article aircraft in accordance with standard commercial practices; its duty to have the aircraft certified in accordance with FAA airworthiness standards; and its duty to provide a copy of the type certificate and other forms at the configuration review.  ¶ 89a-f.

Paragraph 94 of the SAC alleges that the defendants were "obligated and failed to comply with" various federal regulations relating to FAA certification of aircraft and component parts,

including provisions prohibiting the making of any intentionally false statement about the airworthiness of any type-certified product or about the acceptability of any part for installation on a type-certified product. *Citing* 14 CFR § 3.5.  Relators also appear to allege that the defendants failed to comply with obligations to report defects in products or parts that could result in a significant primary structural defect or failure (14 CFR § 21.3); failed to show an established a quality control system to ensure that each article would meet the design provisions of the type certificate (14 CFR § 21.139); failed to maintain the quality control system in accordance with approved procedures and determine that each part submitted for airworthiness certification conforms to the approved design and is in a condition for safe operation (14 CFR § 21.165); failed to manufacture the article in accordance with the applicable "TSO" authorization and to conduct all tests and inspections and maintain the quality control system to ensure that the article meets these requirements and is in condition for safe operation (14 CFR § 21.607); failed to comply with a prohibition on design features or details that experience has shown to be unreliable, and a provision requiring the suitability of each questionable design detail and part to be established by tests (14 CFR § 25.601); and failed to comply with regulatory requirements on fabrication methods (14 CFR § 25.605).

Paragraph 95 of the SAC alleges that guidelines in the Defense Department Handbook on Airworthiness Certification Criteria were incorporated into the contracts and the defendants failed to conform with Section 4.4 on "Manufacturing, support, and quality," and in particular Section 4.4.3 requiring verification of all critical quality standards.  Paragraph 96 alleges that "Joint Service Specification Guide" guidelines were incorporated into the contracts and that defendants failed to conform to its provisions on "Requirements," "Verification," and "Notes," including specifically

identified provisions on materials and processes, rapid decompression, production facilities and processes, and limitations on design tolerance and production processes.

Paragraph 97 alleges that the defendants "were obligated and failed to comply with"FAA Advisory Circular AC21-13 and AC21-1B, including provisions requiring an appropriate quality control system, manufacturing processes, inspection, tools and gauges, supplier control, and materials review.  Paragraph 98 similarly alleges the defendants were obligated to but failed to comply with Boeing's Advanced Quality System D1-9000 Manual requirements.  The SAC sets forth five pages of requirements from the Manual which the Relators contend defendants failed to meet.

Paragraphs 99-102 allege that the defendants were obligated to but failed to comply with "Aerospace Standards" embodied in AS9100 Revision B, AS9102 [and Revision A], and AS9000. The SAC quotes at length the particular standards allegedly violated, and further alleges that these violations occurred despite defendants' "representations of compliance."  Paragraph 103 alleges the defendants were obligated by federal law and regulation, including 49 U.S.C. § 1423(a)(2) and 14 CFR 21, to establish and maintain a quality control system to assure that each aircraft and its component parts will meet the design provisions of the type certificate issued by the FAA, but the defendants "failed to fully and completely maintain and adhere to its approved quality control systems."

Paragraph 104 sets forth various regulatory requirements for payment of invoices on contracts issued by the U.S. Department of Defense.  Relators allege that Boeing was required by regulation to submit invoices to receive payment for its work on the government contracts at issue here, and that Boeing in fact submitted invoices to the Defense Contract Management Agency

(DCMA).  The invoices were then allegedly reviewed along with supporting documentation from Boeing and were forwarded to the Defense Finance and Accounting Service (DFAS) for payment to Boeing.  "By submitting the invoices for payment, either progress or completion, when the subject aircraft contained unverified or nonconforming parts, Boeing submitted false claims to the U.S. government by failing to disclose material information about the nonconformities and deviations from contract specifications, which were essential elements to the U.S. government's decision to pay Boeing."  Moreover, by submitting such invoices for payment, Boeing "provided false implied certifications of compliance with applicable contract terms, specifications, statutes, rules and/or regulations as alleged herein."

Paragraph 105 alleges that the Material Inspection and Receiving Report (MIRR), DD 250, is an invoice-supporting document that the DOD requires on contracts for supplies and services.  "Defendant Boeing was required to prepare and submit certifications of conformance with the contract terms, including ... the DD250 forms, for delivery of each aircraft at issue and delivery of spare parts," and upon information and belief Boeing submitted DD 250's and other documents to the U.S. Government regarding compliance or airworthiness for nonconforming Ducommun parts.  Relators allege that the DD 250 requires a representation that the aircraft or parts "conform to contract, except as noted," and that defendants "failed to fully and completely identify, warn, and disclose any nonconformities on the DD 250 forms" or on other disclosure documents.  Defendants "thereby knowingly made or used, or caused to be made or used, a false record or statement that Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States for payment or approval of a false or fraudulent claim.  Because of the allegations herein, all of these certifications of

10

conformity were false." Further, Boeing "provided false implied certifications of compliance with applicable contract terms, specifications, statutes, rules and/or regulations as alleged herein."

The SAC includes allegations from the prior complaint that the Relators performed an audit at Boeing's behest and documented the numerous shortcomings, failures and falsification of data relating to Ducommun parts. The SAC alleges that the resulting Audit Report was provided to specified high-ranking Boeing executives on August 24, 2000. The SAC includes allegations that numerous Boeing executives were otherwise informed on the substance of the audit. Relators allege that Boeing's legal counsel and other executives "sanitized" the report, including by striking all mention of FAA violations. ¶ 155. The SAC alleges this was part of a decision by Boeing's upper-level management to keep from the U.S. Government and others the fact that non-approved parts had been assembled in the aircraft. Relators allege that when Boeing's Director of Production stated that, in light of the audit, Boeing should issue an Airworthiness Directive to determine what steps were action was required for aircraft already in service, Boeing's Director of Quality told her that "was not going to happen." ¶ 156. It alleges that Boeing's upper management, including CEO Phil Condit, consciously decided to keep from federal regulatory agencies and the U.S. Government the fact that non-approved parts had been and continued to be assembled in its aircraft. *Id*.

The SAC alleges that Boeing retaliated against the Relators for pursuing the matter, including by threatening them with ethics and/or criminal charges if they insisted on verbalizing the allegations, ¶ 170, and by various adverse employment actions.

### B. Rule 9(b) applied to the SAC.

As the court noted in its prior order, Rule 9(b) provides in part: "In all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity. Malice, intent,

knowledge, and other condition of mind of a person may be averred generally." This heightened pleading standard applies to actions under the False Claims Act. *See U.S. ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah*, 472 F.3d 702, 726 (10th Cir. 2006) ; *U.S. ex rel. Schwartz v. Coastal Healthcare Group, Inc.*, 232 F.3d 902 (Table),  2000 WL 1595976 (10th Cir., Oct. 26, 2000) (citing cases). "At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where and how of the alleged fraud." *Schwartz*, 2000 WL 1595976 at ** 3.  The circumstances required to be pled with particularity are the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby. *Id*. (*citing Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).

Liability under § 3729(a) attaches when a person knowingly presents (or causes to be presented) to the U.S. Government a "false or fraudulent claim for payment or approval" or when a person knowingly uses a "false record or statement to get a false or fraudulent claim paid or approved" by the Government. *See* 31 U.S.C. § 3729(a)(1) & (a)(2). *See also United States v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001) (setting forth elements of an FCA claim). A "claim" in this context includes "any request or demand, whether under a contract or otherwise, for money or property...." § 3729(c).  "Thus, whether a claim [for money or property] is valid depends on the contract, regulation, or statute that supposedly warrants it." *United States v. Southland Management Corp*., 326 F.3d 669, 674 (5th Cir. 2003) (*en banc*).

The court concludes that the SAC now satisfies the requirements of Rule 9(b) with respect to Relators' FCA claims against defendant Boeing.  Relators have adequately alleged that Boeing knowingly presented false claims for payment to the U.S. Government.  Relators have adequately

specified the particular aircraft that are the subject of their complaint. *See* SAC ¶¶ 30-31. The SAC identifies the numerous Ducommun parts that were allegedly nonconforming or defective. The SAC now spells out how these parts, and the processes used to manufacture them, allegedly failed to conform to contract requirements, military specifications, and FAA (and other) requirements. According to the SAC, the defendants provided the aircraft to the Government pursuant to contractual agreements that required full compliance with defendants' internal policies, Federal Aviation Regulations, industry aerospace standards (AS), DOD Handbook on Airworthiness Certification Criteria, the Joint Service Specification Guide, and other specified standards. The SAC sets forth particular standards allegedly violated, such that the SAC provides adequate notice to the defendants of the alleged shortcomings relating to the manufacture and use of Ducommun parts.

The SAC also identifies the particular contracts at issue, and alleges that in connection with delivery of the aircraft to the Government Boeing provided a Type Data Certificate, a Certificate of Airworthiness, and a Statement of Conformity, all of which were materially false in that Boeing falsely certified its compliance with FAA Advisory Circular requirements and contract specifications, and concealed the fact that the aircraft were nonairworthy and potentially dangerous. Paragraph 89 of the SAC identifies in detail contractual, regulatory and procedural standards as to which Boeing allegedly made false representations of compliance. Subsequent paragraphs identify other regulations and standards with which the defendants allegedly failed to comply. The SAC alleges that by submitting invoices for payment when the aircraft contained unverified or nonconforming parts, Boeing submitted false claims for payment because it failed to disclose material information and certified compliance with the contract terms and other binding standards. *Cf. Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519 (10th Cir. 2000) (in submitting

13

monthly invoices, contractor impliedly certified that it complied with the provisions in the contract). The SAC further alleges that Boeing knowingly used false records – including forms DD 250 – to obtain payment of its claims when it failed to disclose on those forms the alleged material nonconformities of the Ducommun parts.

Unlike the First Amended Complaint, Relators have now identified the contractual and other obligations allegedly imposed on defendants in connection with the sale of the aircraft,  and they allege with sufficient particularity how the defendants failed in those obligations.  The SAC also specifies the making of false certifications or representations (express and implied) to the U.S. Government, and it makes allegations tying such false representations to the submission of actual claims for payment.  *Cf. U.S. ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1257 (D.C. Cir. 2005) (complaint failed to meet Rule 9(b) by failing to clarify what the contractor misrepresented to the Government).   The contents or substance of false representations or certifications are spelled out in the SAC and are tied to claims for payment from the Government, thus satisfying the notice requirement that underlies Rule 9(b).  And while it is true the SAC still does not identify any particular single invoice or claim of the defendants, the allegations identifying the particular *type* of invoices and claims submitted, together with identification of the contracts at issue and the substance of alleged false representations or material omissions to the Government, are sufficient in the court's view to provide the notice required by Rule 9(b).  Relators have explained with sufficient particularity the circumstances surrounding the defendants' alleged submission or use of false claims.

The court is not persuaded by Boeing's arguments to the contrary.  Boeing argues the allegations are insufficient because Relators still fail to state "the process by which supposedly

14

defective Ducommun parts were knowingly installed by Boeing ... and yet certified as conforming...."  But the SAC identifies the contracts and parts at issue, the defendants' alleged contractual and regulatory obligations and the manner in which defendants failed to meet those obligations, the defendants' alleged knowledge of the material nonconformities, the defendants' alleged decision not to disclose the nonconformities to the Government purchasers, the submission of claims for payment to the U.S. Government in connection with the contracts, the substance of the alleged false certifications or material omissions in connection with claims for payment, and the resulting harm to the Government.  Taken as a whole, the allegations are sufficient to put the defendants on notice of the basis of the FCA claims.  Greater detail is not required at the pleading stage.

Boeing also complains that the SAC fails to allege what Boeing's quality control system determined about the suitability of the Ducommun parts.  According to Boeing, "[t]here can be no doubt ... that if Boeing's quality system determined that there was nothing wrong with a part, notwithstanding manufacturing process errors, there could be no 'fraud' on the government."  Doc. 74 at 13.  But the SAC alleges that Boeing's quality control "failed to legitimately determine that the nonconforming parts were acceptable and suitable for use...."  ¶ 26.  If further alleges that despite knowledge that the parts were manufactured in violation of contract specifications and other standards, Boeing's quality control failed to require corrective action relating to defective parts, falsified records to allow the parts to be assembled in aircraft, and failed to disclose such matters to the U.S. Government.  ¶ 27.  The SAC further alleges that Boeing's management made a conscious decision to keep from federal regulatory agencies and the U.S. Government the fact that non-approved parts had been and continued to be assembled in its aircraft. ¶¶ 155-57.  Construed in the

15

light most favorable to Relators, the complaint does allege that Boeing's quality control failed to make any genuine determination that the parts were suitable for use and, with the knowledge and assent of Boeing management, nevertheless certified the parts and the aircraft without disclosing the defects to the Government.  Of course, these allegations may or may not be true – that is a matter to be determined from proof – but at this stage of the proceeding the allegations are sufficient to withstand a motion to dismiss.  Similarly, Boeing's arguments relating to Supplier Evaluation Reports and whether they in fact support Relators' allegations that defective parts were knowingly certified and installed by Boeing, is a matter of proof rather than a question of particularity under Rule 9(b).  Boeing also points out – with some justification – that the SAC includes a number of regulatory passages without any specific explanation as to how Boeing violated the standards therein.  The court is somewhat at a loss to understand why Relators have not set forth their claims in a more concise and clear fashion.  Nevertheless,  the court concludes that the allegations in the SAC as a whole are legally sufficient to disclose the bases of the Relators' claim of fraud or use of false documents.  In sum, the court finds the SAC has stated with particularity the circumstances constituting fraud, as required by Rule 9(b).

II. *Ducommun's Motion to Dismiss*.

Ducommun's motion to dismiss raises several of the same (or similar) arguments as Boeing, but the court rejects those arguments for the same reasons previously stated.  Ducommun also raises additional points, which are summarized in its brief at Pp. 2-4 (Doc. 73).  After considering these arguments in light of the allegations in the SAC, the court concludes that none of the arguments merit dismissal of the complaint under the standards of Rule 9(b) and Rule 12(b)(6).

Ducommun complains that the SAC fails to identify any contracts or purchase orders

between Ducommun and Boeing, and fails to identify any claim for payment or false statement made by Ducommun to Boeing which was then passed on to the federal government.  It also argues there is no allegation that Ducommun deceived Boeing and as such, the SAC fails to allege that Ducommun submitted claims to Boeing with knowledge that it was not entitled to be paid.   As the court noted previously, however, Relators have identified specific contracts between Boeing and the U.S. Government as to which Boeing allegedly presented false claims for payment to the Government.  And it is "well settled" that the False Claims Act gives the United States a cause of action against a subcontractor who *causes* a prime contractor to submit a false claim to the Government.  *See United States v. Bornstein,* 423 U.S. 303, 309 (1976).  Liability under the FCA thus does not necessarily require proof that the subcontractor submitted false claims to the prime contractor, if the subcontractor caused the presentation of false claims by the prime contractor.  *See* 31 U.S.C. § 3729(a)(1) (liability for knowingly causing presentation of false claim).  *Cf. Bornstein,* supra (subcontractor's knowledge of defect, together with knowledge that prime contractor would include the defective product in items shipped to the Government and seek payment thereon, supported finding that subcontractor caused submission of false claims).  The SAC alleges (among other things) that Ducommun knowingly engaged in an extensive pattern of producing articles that did not conform to contract specifications and binding regulations, that it falsified numerous records to make it appear the company had followed required inspection procedures, and that it attempted to deceive Boeing's audit teams by maintaining two sets of books concerning its manufacturing processes.  It alleges that Ducommun's President admitted to having violated its procedures, along with Boeing, in order to get the work done in time.  It alleges that the audit team's findings of wrongdoing were adopted by Boeing as part of a settlement with Ducommun.  Paragraph 192 of the

17

SAC alleges that Ducommun thereafter "knowingly caused to be submitted through defendant Boeing false or fraudulent claims for payment or approval" to the U.S. Government.  These two allegations – that Ducommun "caused" the submission of false claims and that it did so "knowingly" – are not subject to the particularity requirement of Rule 9(b), which only requires specificity of the circumstances constituting fraud or mistake.  Under Rule 9(b), knowledge and other states of mind "may be averred generally."  The fact that these allegations are made generally, then, does not provide grounds for dismissal.  And accepting the allegations as true, as the court must on a motion to dismiss, they state a proper claim for relief under the FCA.  *Cf. U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235 (3rd Cir. 2004) (where subcontractor's scheme was a substantial factor in bringing about the contractor's filing and was a normal consequence thereof, subcontractor could be found to have cause the filing).

Ducommun also argues the SAC should be dismissed because it fails to allege that anyone at Ducommun knew parts sold to Boeing's commercial plane division would be included on aircraft sold to the U.S. Government.  The allegation that Ducommun "knowingly" caused the submission of false claims to the Government, however, arguably encompasses an assertion that Ducommun knew (through its officers or employees) that false claims were presented to the Government relating to its work.  As noted above, Rule 9(b) permits allegations of knowledge to be made generally.  Accordingly, the SAC is not subject to dismissal for failure to be more specific as to Ducommun's knowledge.  Finally, Ducommun argues the SAC fails to clarify what parts are at issue or the nature of the alleged defects.  "Absent particular allegations as to which parts were supposedly defective, the nature of the defect, and who at Ducommun knew of the alleged defect," defendant argues, "relators cannot state a sufficient claim against Ducommun."  Doc. 73 at 4.  The SAC does provide

notice, however, as to what Ducommun parts were allegedly defective and the nature of those defects.  It also now identifies the alleged false certifications or representations made by Boeing in connection with claims for payment on specific aircraft, albeit by identifying types of invoices and documents generally rather than specific, discrete documents.  As for Ducommun's alleged knowledge, for reasons stated above the court finds that the general allegations of knowledge in the SAC are sufficient for purposes of a motion to dismiss.  Moreover, the court notes that the SAC, liberally construed,  alleges that the President of Ducommun (among others) was aware of the alleged defects in Ducommun's parts and processes.  In sum, the court rejects Ducommun's assertion that the SAC should be dismissed on its face.

III.  _Conclusion_.

Ducommun's Motion to Dismiss the Second Amended Complaint (Doc. 73) and Boeing's Motion to Dismiss Count 1 of the Second Amended Complaint (Doc. 74) are DENIED.  IT IS SO ORDERED this  4th   Day of June, 2007, at Wichita, Ks.

s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge