**EXHIBIT C**

Case 6:05-cv-01073-JTM-GEB   Document 683-2   Filed 04/12/13   Page 1 of 9

Regional Counsel
JUN 01 2010
ANM-7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* TAYLOR SMITH, JEANNINE PREWITT, AND JAMES AILES, <br><br> Plaintiffs and Relators, <br><br> v. <br><br> THE BOEING COMPANY and DUCOMMUN, INC., f/k/a AHF-Ducommun, <br><br> Defendants. | Civil Action No. 05-1073-WEB <br><br> **DECLARATION OF ROBERT G. EASTIN, FEDERAL AVIATION ADMINISTRATION** |

Robert G. Eastin hereby declares as follows:

1. I am currently employed as the Chief Scientific and Technical Advisor for Fatigue and Damage Tolerance at the U.S. Federal Aviation Administration (FAA). I understand that Relators Taylor Smith, Jeannine Prewitt and James Ailes have filed a False Claims Act suit against Boeing and its supplier Ducommun. Except where otherwise stated, I have personal knowledge of the facts stated herein.

EXHIBIT E

- 1 -

A.     **Background and Qualifications**

2.     Attached as an Appendix to this declaration is a general description of some of the FAA's roles and responsibilities. Although my work does not deal directly with all aspects of the FAA's work as described in the Appendix, the description is accurate to my knowledge.

1.     **The Chief Scientific and Technical Advisors Program**

3.     The FAA established the Chief Scientific and Technical Advisors (CSTA) program pursuant to FAA Order 8000.80 in order to form a cadre of specialized technical experts of worldwide reputation who: (a) are at the forefront of scientific and technological activities related to FAA research and development efforts; (b) influence the research agendas of U.S. and foreign aviation industries, military, academia, and other research institutions; and (c) interact with and assist other U.S. government agencies and foreign civil aviation authorities in technology-related issues. The CSTA play a technical leadership role within the FAA and the aviation industry in the design and development of aircraft and in the application of regulatory policies and practices for certification of state-of-the-art technology. The CSTA program is located within the FAA's Aviation Safety Organization.

2.     **Personal Qualifications**

4.     I have over 40 years experience in structural analysis and design, with specialization in the area of fatigue and damage tolerance. The technical discipline of fatigue and damage tolerance is used, for example, to conduct evaluations resulting in inspection programs to protect the safety of both aging and new aircraft fleets.

5.     I previously worked with four major aerospace companies, and joined the FAA in 1997 from McDonnell Douglas Corporation. I have not been employed by Boeing. In my current position with the FAA, I advise on structural fatigue and damage tolerance issues involving analysis, test, operation, and research and development on large and small transport

- 2 -

aircraft, general aviation aircraft, engines and rotorcraft. I also have served as an advisory member on several Aviation Rulemaking Advisory Committee Working Groups tasked with recommending changes to civil aviation and advisory material. I have written, contributed to, and made technical presentations on aircraft structural integrity, aging aircraft, individual aircraft tracking and phased gust loads for full scale durability testing and civil aircraft certification requirements.

6.  I have a bachelor of science degree in Aerospace Engineering from Georgia Institute of Technology and a masters of science degree in Engineering Mechanics from Old Dominion University.

7.  Given my qualifications and position at the FAA, I was asked to evaluate plaintiffs' evidence and determine whether Boeing aircraft with Ducommun parts are unsafe and if there are grounds for Airworthiness Directive ("AD") action.

## B.  Relators' Allegations

8.  I reviewed materials from the government's files regarding plaintiffs' lawsuit, including the complaint filed in this case, correspondence and attachments relating to plaintiffs' allegations, a presentation given by plaintiffs' counsel and their experts to the FAA in January 2010, documents relating to prior FAA investigations of plaintiffs' allegations, and certain Boeing engineering drawings, quality system documents and audit records. In addition to reviewing materials, I consulted as necessary with FAA colleagues, including the Chief Scientific and Technical Advisor for Metallurgy.

9.  In the material reviewed, the plaintiffs made numerous allegations concerning certain Ducommun parts installed on certain 737NG and C40 airplanes. However the single allegation that I focused on is the one stated in the Second Amended Complaint in paragraph 1 that reads, "For these reasons, Boeing aircraft with Ducommun unapproved parts are not

- 3 -

airworthy, are not safe, and must be grounded." More specifically, in my review I was looking for evidence that would suggest that an unsafe condition exists in any of the affected airplanes and, if so, that the condition is likely to exist or develop in other airplanes. If found, such evidence would be grounds for AD action in accordance with FAR 39.5. If not, the FAA would have no grounds for AD action.

10.  In conducting the review, I did not concern myself with the categorization of the parts in terms of level of flight safety criticality. I simply assumed, for purposes of my review, that the parts are flight safety critical (whether they are or not), such that any discrepancies that affect form, fit or function would have to be addressed.

11.  The plaintiffs allege that something called Advanced Technology Assembly ("ATA") was required to be used but was not thereby creating a "nonconformance". Based on my understanding of ATA it is an assembly approach that uses certain holes in individual parts to facilitate assembly of these parts. This is a common approach used to assemble many products and is not unique to airplanes. When practical it mitigates the need for large and expensive assembly jigs that individual parts are loaded into and rigidly held in set positions for subsequent assembly. ATA was the planned assembly approach for the subject parts and the fact is that ATA was used to assemble all the subject parts. It appears that designers had envisioned that the locating holes would primarily be created using an automated process and control of automated processes typically requires the collection and analysis of statistical process control ("SPC") data. The designers, however, also permitted an alternative process of creating the holes using drill fixtures and hand drilling and, in practice, it was found to be a more cost effective part fabrication process. Although the engineering drawings identify the locator hole dimensional requirements, they do not dictate the method of creation. Even if the engineering drawings had required an automated process for hole creation, the used of hand drilling using drill fixtures

- 4 -

would not, in itself, be a safety concern and could have easily been dispositioned by a Material Review Board ("MRB").

12. In performing my review, I specifically was looking for documented discrepancies with parts that were either improperly dispositioned by MRB or not dispositioned at all and still assembled into airplanes. Some examples of part discrepancies that must be dispositioned because they might result in an unsafe condition include:

- Incorrect material and/or improper material processing (e.g. heat treatment) leading to under-strength parts.

- Nonconforming dimensions (e.g. thickness) resulting in under-strength parts or unacceptable fit up stresses that might result in premature fatigue.

- Mislocated holes resulting in unacceptable fit up stresses and/or detrimental stress concentrations that might lead to premature fatigue cracking.

I found no evidence of any such discrepancies that were not properly dispositioned by MRB. Instead, plaintiffs point to a variety of quality system issues at Ducommun, none of which constituted part discrepancies requiring MRB action.

13. In the review I also looked for any evidence of in-service findings (e.g. corroded, cracked, failed or otherwise distressed parts). I found none.

C. **Conclusions**

14. Based on my review, there is an absence of evidence that would support the plaintiffs' fundamental allegation that affected airplanes are not safe and should be grounded. On the contrary, evidence indicates that the form, fit and function of the subject parts are as required due to conformance with the engineering drawings or as determined by MRB action for documented nonconformities. I see no need for the FAA to take any actions related to the safety of the affected airplanes, including issuance of any Airworthiness Directives.

**I declare under penalty of perjury that the foregoing is true and correct.**

- 6 -

EXECUTED this 28th day of May, 2010.

_____
ROBERT G. EASTIN
Chief Scientific and Technical Advisor
Federal Aviation Administration

Appendix – Background on the FAA

Title 49 of the United States Code, Section 106, defines the FAA and the general requirements and responsibilities of the FAA Administrator.  Section 447 of Title 49 contains requirements for the FAA to promote safe flight by prescribing standards for design, materials, construction, quality and aircraft operational parameters.  Part 21 of Title 14 of the Code of Federal Regulations contains the primary regulations governing commercial aircraft design, manufacturing, and inspection activities.  Part 25 contains airworthiness standards for the issuance of type certificates for transport category aircraft.

In general terms, an FAA Production Certificate signifies that the holder has demonstrated to the FAA that it complies with Part 21 of the Federal Aviation Regulations, including that the company has and can maintain a quality control system for products to be manufactured under the Production Certificate.  14 C.F.R. § 21.139.  Boeing's FAA Production Certificate, PC 700, entitles the company to produce at specified facilities certain airplane types whose designs have been approved by the FAA via a Type Certificate.  The FAA issues Airworthiness Certificates (or, alternatively for commercial derivative aircraft, a Conformity Certificate – Military Aircraft, FAA Form 8130-2) for individual aircraft that are found to conform to the FAA-approved type design and are in a condition for safe operation.  In summary, where the FAA issues a Type Certificate (or Supplemental Type Certificate) for an aircraft model, adds that model's type design to the Production Limitation Record of Production Certificate 700, and issues an Airworthiness Certificate for an aircraft of that model, the FAA has certified that the aircraft complies with the Federal Aviation Regulations.

To determine whether Boeing is in compliance with its Production Certificate, and whether it is necessary to amend, modify, suspend or revoke that certificate, the FAA employs a variety of surveillance and enforcement personnel and tools.  For example, the FAA uses

Aviation Safety Inspectors (ASI) who have expertise and qualifications concerning the conformance of aircraft to the applicable type design, certification of aircraft as airworthy, inspection techniques, and quality system requirements. The FAA also utilizes statutorily authorized designees, such as Designated Engineering Representatives (DER), Designated Manufacturing Inspection Representatives (DMIR), and Designated Airworthiness Representatives (DAR) to act as surrogates for the FAA in examining aircraft designs, production quality, and airworthiness. The FAA also conducts audits of the facilities of production certificate holders.

Finally, the FAA has a variety of enforcement mechanisms. It has the authority and obligation to amend, modify, suspend or revoke a Production Certificate if it concludes that the holder is not conforming to the requirements of 14 C.F.R. Part 21. The agency may also amend, modify, suspend or revoke an Airworthiness Certificate if a particular aircraft or model is determined not to conform to the type design or is not in a safe condition for operation. The FAA also has the authority to assess civil penalties for violations of certain aviation laws and regulations. The FAA has the authority to issue Airworthiness Directives pursuant to 14 C.F.R. § 39 to correct unsafe, or potentially unsafe, conditions on aircraft or aircraft components.